# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.: 1:21-cr-00537-JMC** |
| **v.** | : | |
| | : | |
| **RYAN SAMSEL,** | : | |
| **JAMES TATE GRANT,** | : | |
| **PAUL RUSSELL JOHNSON,** | : | |
| **STEPHEN CHASE RANDOLPH, and** | : | |
| **JASON BENJAMIN BLYTHE,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS COUNTS 1, 5, 6, 7, AND 10 OF THE THIRD SUPERSEDING INDICTMENT

The United States of America respectfully submits this omnibus response in opposition to defense Motions to Dismiss Counts One, Five, Six, Seven, and Ten of the Third Superseding Indictment, ECF 204, 205, 208, 210.[1] These motions rest on arguments that courts in this district have, with only one exception, unanimously rejected. The Defendants' motions offer no new arguments or authorities and should likewise be denied for the reasons explained herein.

## PROCEDURAL BACKGROUND

This case arises from the January 6, 2021 attack on the United States Capitol. On January 13, 2022, a federal grand jury in the District of Columbia returned a 14-count indictment, the Third Superseding Indictment in the above-captioned case, charging Samsel, Grant, Johnson, Randolph, and Blythe with Obstruction of Law Enforcement During a Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2 (Count One);

---

[1] The government is responding separately to Defendant Johnson's motion to change venue, ECF 203, and to Defendant Randolph's motion to dismiss Case No. 21-cr-332, ECF 206.

two felony counts related to Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Inflicting Bodily Injury, and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1), (b), and 2 (Counts Two and Three); three felony counts relating to disorderly conduct and violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752 (Counts Five–Seven); two misdemeanor counts relating to disorderly conduct and violence in a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2) and 18 U.S.C. § 2 (Counts Eight and Nine); and Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Ten). ECF 80. Randolph was charged alone in a separate count with Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Four). Samsel was charged alone in two separate counts: Obstruction of Law Enforcement During a Civil Disorder, in violation of 18 U.S.C. § 231 (Count Eleven) and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Twelve). Grant was also charged alone in two separate counts: Entering and Remaining in Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C) and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Defendants now move to dismiss Counts One, Five, Six, Seven, and Ten of the Third Superseding Indictment. ECF 202, 204, 205, 208, and 210. Specifically, Randolph moves to dismiss Counts One, which charges violation of 18 U.S.C. 231(a)(3), ECF 204; Randolph and Blythe move to dismiss Counts Five, Six, and Seven charging 18 U.S.C. § 1752, ECF 205, 210; and Blythe, Johnson, and Samsel move to dismiss Count Ten (charging 18 U.S.C. 1512). ECF

203, 208, 210.[2]  Each motion contends that the addressed counts fail to state an offense or that they lack the requisite specificity. Fed. R. Crim. P. 12(b)(3)(B)(iii), (v).

## **LEGAL STANDARD**

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). And an indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition

---

[2] All Defendants also filed notices to adopt some combination of their Co-Defendants' arguments. ECF 207, 208, 211, 212, 213.

before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) (motions for summary judgment are creatures of civil, not criminal trials); *Yakou*, 428 F.2d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-cr-40-BAH at *5, 2020 WL 6342940 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and more specifically, the language used to charge the crimes. *Bingert*, No. 21-cr-93 (RCL), ---F.Supp.3d ---, 2022 WL 1659163 at *3 (D.D.C. 2022) (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed); *United States v. McHugh*, No. 21-cr-453 (JDB), 2022 WL 1302880 at *2 (a motion to dismiss involves the Court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *United States v. Puma*, No. 21-cr-454 (PLF), ---F.Supp.3d---, 2020 WL 823079 at *4 (D.D.C. Mar. 19, 2022) (quoting *United States v. Sunia*, 643 F.Supp. 2d 51, 60 (D.D.C. 2009)).

# ARGUMENT

## I.    Count One (18 U.S.C. § 231)

Count One charges all Defendants with violating 18 U.S.C. § 231(a)(3).   Defendant Stephen James Randolph argues that Count One of Third Superseding Indictment does not contain facts essential to the offense charged, and that Section 231 is unconstitutionally vague. Both arguments are without merit and should be denied for the reasons articulated below.[3]

### a.   The Third Superseding Indictment provides sufficient notice

First, Randolph contends that Count One should be dismissed because it does not provide adequate specificity and information as to the charge against him. Randolph premises this challenge on the Sixth Amendment right "to be informed of the nature and the cause of the accusation" and Federal Rule of Criminal Procedure 7(c)'s requirement that an indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged."

Randolph misunderstands the purpose of an indictment and the low bar it must clear to satisfy the Federal Rules of Criminal Procedure and the Constitution. As the D.C. Circuit explained in *United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976), "[a]lthough an indictment must in order to fulfill constitutional requirements apprise the defendants of the essential elements of the offense with which they are charged, neither the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every means by which the prosecution hopes to prove that the crime

---

3 Defendants Blythe, ECF 211, Grant, ECF 212, and Johnson, ECF 213, submitted filings stating their intent to join Randolph's motion to dismiss Count One.

was committed." *Id.* at 124. Indeed, "the validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). "While detailed allegations might well have been required under common-law pleading rules . . . they surely are not contemplated by Rule 7(c)(1), which provides that an indictment 'shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *Id.* at 110. As a mere notice pleading, an indictment is sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007); *Haldeman*, 559 F.2d at 123 ("The validity of alleging the elements of an offense in the language of the statute is, of course, well established."). Only in the rare case where "guilt depends so crucially upon . . . a specific identification of fact" not included in the statutory language will an indictment that restates the statute's language be insufficient. *Haldeman*, 559 F.2d at 125 (quoting *Russell v. United States*, 369 U.S. 749, 764 (1962)).

Applying these principles, judges in this District have upheld the sufficiency of indictments far less specific than Randolph's. For example, in *United States v. Apodaca*, 275 F. Supp. 3d 123 (D.D.C. 2017), the defendants were charged with offenses under 18 U.S.C. § 924(c). The indictments provided only "general detail as to the places where the offenses were committed: namely, Mexico and the United States." *Id.* at 154. As to the "when" of the offenses, the indictments alleged that the offenses had occurred over a two- and nine-year period. *Id.* Finally, the indictments "d[id] not specify a particular weapon that was possessed," or "specify whether the firearms were 'used, carried or brandished'" under the statute. *Id.* Nonetheless, the

6

indictments were sufficient.

Judges in this District have also rejected specificity challenges to indictments that arose out of the January 6, 2021 riot at the U.S. Capitol and are identical to the operative indictment in this case. For example, in *United States v. Sargent*, Judge Hogan rejected a similar specificity challenge to an indictment charging Section 231 and other charges also faced by Defendants in this case. No. 21-CR-258, 2022 WL 1124817, at *3 (D.D.C. Apr. 14, 2022). In a careful and deliberate opinion, Judge Hogan concluded that every one of the charged counts was properly alleged because each stated the elements of the offense and, though the charging language closely mirrored the statute, no further factual allegations were required to provide notice or protect against double jeopardy concerns. *Id.* at *2–*10.

In *United States v. Williams*, Judge Berman Jackson similarly found that the language of an indictment charging a violation of 18 U.S.C. § 231(a)(3) that largely tracked the statute was sufficiently specific. No. 21-CR-618, 2022 WL 2237301, at *8 (D.D.C. June 22, 2022). She observed: "the first paragraph of the indictment comprising Count I sets forth all of the elements of section 231(a)(3) . . . It thereby enables Williams to prepare a defense and plead that an acquittal or conviction is a bar to future prosecutions." *Id.*

The Section 231(a)(3) charging language that passed muster in *Williams*, *see* No. 21-CR-618, ECF 27:1-2 (Count One), is identical to Count One of the indictment here, *see* ECF 80:2 (Count One), with the primary exception being that Randolph's indictment is *more* specific because, as Randolph himself concedes, ECF 204:8, the government also identifies the particular law enforcement personnel relevant to the conduct charged.

Randolph does not dispute that all of the elements of each offense are properly alleged in

the indictment. That, by itself, identifies the criminal conduct with which Randolph is charged. As in *Sargent* and *Williams*, the indictment provides sufficient information to fairly inform Randolph of those offenses. Randolph knows the day on which the alleged crimes occurred: January 6, 2021, which is alleged in all counts. *See* ECF 80. He knows that all charged conduct occurred in this District, from the indictment's allegation. *Id.* Multiple counts specifically refer to conduct on U.S. Capitol grounds, further narrowing the "where" of the charged crimes, and at a time when the Vice President was and would be temporarily visiting. Counts One and Eleven relate specifically to an existing civil disorder and to a law enforcement officer. ECF 80. Counts Two, Three, Five, Six, and Seven refer to the specific type of "deadly or dangerous weapon" that Defendants used: a metal crowd control barrier. *Id.* The statutes charged are not so unusually vague that they require allegations beyond the elements of the offenses.

Randolph complains that the indictment does not articulate *how* the government intends to prove that a civil disorder existed, as Section 231 provides three separate avenues for doing so. ECF 204:7. But Randolph's "complaint seems to result . . . from a general misunderstanding of the purpose of the indictment and, especially, from an inflated notion of what must be included therein." *Haldeman*, 559 F.2d at 124. As the D.C. Circuit concisely explained in rejecting an identical argument in *Verrusio*:

> Verrusio contends that Count Two of the indictment failed to allege an official act because it failed to say "how Mr. Verrusio was going to use his position" to help United Rentals . . . . The indictment certainly need not allege precisely how Verrusio contemplated [committing the crime]. Would he do it by himself or ask someone else to do it? Would that someone else be Colonel Mustard or Professor Plum? With a candlestick or a rope, in the library or the study? Answering those questions is not required at the indictment stage.

762 F.3d at 14-15. For that reason, Judge Hogan in *Sargent* rejected an argument just like

8

Randolph's, concluding that the indictment need not allege the specific facts detailing precisely how the government believes the defendant violated the statute. *See* 2022 WL 1124817 at \*3, \*4, \*7, and \*10. Instead, as noted above, an allegation of fact beyond the statute's elements is required only if "guilt depends so crucially upon such a specific identification of fact." *Id.* at \*10 (quoting *Russell*, 369 U.S. at 764). As Judge Hogan correctly concluded, that is not true with respect to the crimes charged against Randolph in in Count One. And Randolph identifies no required factual allegation that is missing from the charging language in Count One, either. Randolph's specificity argument fails.

### b.  18 U.S.C. § 231 is not unconstitutionally vague

Randolph also brings a facial challenge to Section 231, arguing that it is unconstitutional on its face for several reasons: (1) Section 231 criminalizes "any act to obstruct, impede, or interfere" which "reaches the outer limits of verbal and expressive conduct without drawing any distinction that could exclude acts undertaken merely to convey a message or symbolic content." ECF 204:9; (2) the term "civil disorder," as defined in Section 231, "offers no limitation" and "there is no indication whether the defendant is required to have participated in the civil disorder, or if it is sufficient that he or she be in the general vicinity of the event." *Id.* at 10; (3) Section 231 is subject to challenge because it lacks a scienter requirement, *Id.*; and (4) Section 231 is subject to challenge "by expansively encompassing 'any act' that could interfere with the duties of a law enforcement officer during a civil disorder." *Id.* at 11. None of these arguments has merit, and they were appropriately rejected by another judge in this District. *See United States v. Mostofsky*, 579 F. Supp. 3d 9, 14 (D.D.C. 2021).

Constitutional statutory analysis begins with the statute's plain language. *United States v.*

*Shill*, 740 F.3d 1347, 1351 (9th Cir. 2014). Federal legislation enjoys a presumption of constitutionality that may only be overturned "upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Section 231(a)(3) criminalizes any act or attempted act to "obstruct, impede, or interfere" with a law enforcement officer "lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function." The statute defines civil disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).

Randolph's motion, and particularly his first claim that the statute could apply to conduct "undertaken merely to convey a message or symbolic content," is most appropriately cast as an overbreadth argument—that is, he contends that Section 231 criminalizes too wide an array of activity including protected speech. Overbreadth can invalidate a criminal law only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008), quoting *New York v. Ferber*, 458 U.S. 747, 769-771 (1982); *see also City of Houston v. Hill*, 482 U.S. 451, 458 (1987). "A statute is facially invalid if it prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 293; *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). An overbreadth challenge faces a steep climb when the statute focuses mainly on conduct, as Section 231(a)(3) assuredly does. *See Virginia v. Hicks*,

539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct").

In *United States v. Mechanic*, 454 F.2d 849 (8th Cir. 1971), the Eight Circuit rejected a similar overbreadth challenge to Section 231(a)(3). "The operative words of the statute are 'whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer.'" *Id*. 852. "Thus, the section applies only to a person who acts to impede, obstruct, or interfere with an official described in the statute." *Id*. The Eighth Circuit held that "conduct involved here [the massing of a mob that threw stones at an R.O.T.C. building on a college campus to protest the Viet Nam war, followed by rock and bottle throwing at fireman who arrived to quell the disturbance] is not entitled to constitutional protection," *as* "[t]he First Amendment has not been extended to protect rioting, inciting to riot, or other forms of physical violence." *Id.* (citing *National Mobilization Com. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969)). Thus, the Eighth Circuit concluded, Section 231(a)(3) "does not purport to reach speech of any kind. It reaches only acts to impede, obstruct, or interfere with police officers and firemen." *Id.; see also United States v. Wood*, 2021 WL 3048448, at *7 (D. Del. July 20, 2021) ("This Court agrees with *Mechanic* that § 231(a)(3) applies to conduct, not speech.").

Because "the statute does not attempt to curtail speech the defendants may not challenge it as vague or overly broad if their own conduct may be constitutionally prohibited, since . . . one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *Mechanic,* 454 F.2d at 853, citing *United States*

11

*v. Raines*, 362 U.S. 17, 21 (1960). Accordingly, as Judge Boasberg in *Mostofsky* found, Section 231's "plain text, . . . indicates that it is 'targeted primarily if not exclusively at conduct rather than speech,'" rendering defendant's overbreadth challenge without merit. *Mostofsky*, 579 F.Supp.3d 9 at 22.

Randolph next claims that Section 231 is subject to challenge because, according to Randolph, he cannot tell whether the statute requires an individual to have participated in the civil disorder or if it is sufficient that he be in the general vicinity of the event. This argument, too, is meritless. "The crime set forth by the statute is not mere presence at a civil disorder . . . but an act committed during the course of such a disorder, so 'civil disorder' simply describes the environment in which the act must be committed in order to be subject to prosecution under § 231(a) (3)." *Mechanic*, 454 F.2d at 852; *see also United States v. Howard*, 2021 WL 3856290, at *14 (E.D. Wis. Aug. 30, 2021) ("[T]he statute does not require the government to prove that the defendant created the civil disorder, or that he was participating in the civil disorder."). Moreover, "it is not just any public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual." *Mechanic*, 454 F.2d at 853; *see* 18 U.S.C. § 232(1).

Third, Randolph claims that Section 231 lacks a scienter element, which he asserts weighs further in favor of the statute's overbreadth or vagueness. ECF 204:10. But the scienter requirement clearly implied by the language neutralizes this concern. The statute requires proof that the underlying act was done "to obstruct, impede, or interfere" with a firefighter or law enforcement officer, *i.e.* the defendant's purpose or intent in performing the act must be to

obstruct, impede, or interfere. *See Mechanic*, 854 F.2d at 854 ("§ 231(a) (3) must be construed to require intent"); *United States v. Featherston*, 461 F.2d 1119, 1122 (5th Cir. 1972) (§ 231(a)(3) is not unconstitutional on its face because the statute requires intent and "does not cover mere inadvertent conduct"); *Williams*, 553 U.S. at 294 (focusing on scienter requirement in finding that a statute was not overbroad). Even if the statute lacked an express scienter requirement, courts "generally interpret . . . criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances, we construe a criminal statute to include a mens rea element even when none appears on the face of the statute.").

More generally, Randolph states that the "imprecise language" of Section 231 creates the risk that the statute's scope could entirely depend on "a law enforcement official's unbounded speculation about subjective factors." ECF:10. This appears to argue that Section 231 is void for vagueness, but fails to make the requisite showing for such a claim. A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. at 732 (*citing City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)); *see also United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996)*. But Section 231 is not vague; it punishes intentional conduct directed against firefighters and law enforcement officers carrying out their official duties during a civil disorder. The statute prohibits only concrete "act[s]" that are performed with the specific purpose to "obstruct, impede, or interfere" with firefighters or law enforcement. And it prohibits not the

13

mere presence at a civil disorder, but rather, "an act committed during the course of such disorder." *Mechanic*, 454 F.2d at 853.

The statute's intent is plain and provides ample notice, as every court that has considered this issue has found. *Mechanic*, at 853–54 ("§ 232, read in conjunction with § 231(a) (3), is sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden under it"); *United States v. Huff*, 630 F. App'x 471, 487-89 (6th Cir. 2015) (unpublished) ("[W]e reject Huff's void-for-vagueness argument [regarding § 231(a)(3)] in all respects"); *United States v. Banks*, 368 F. Supp. 1245, 1247 (D.S.D. 1973) (rejecting vagueness challenge to § 231(a)(3), following *Mechanic*), *abrogated on other grounds by United States v. Auginash*, 266 F.3d 781 (8th Cir. 2001); *see generally Wood*, 2021 WL 3048448, at *9 ("Defendant does not have standing to bring a facial vagueness challenge" to § 231(a)(3) because he failed to "demonstrate that [the statute]is vague as applied to his conduct").

Section 231(a)(3) is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden." *Mechanic*, 454 F.2d at 854. Randolph's facial attack on Section 231 should be rejected.

II.     **Counts Five, Six, and Seven (18 U.S.C. § 1752)**

Defendants Jason Blythe and Stephen Randolph move to dismiss Counts Five, Six, and Seven, charging 18 U.S.C. § 1752, on two grounds: (1) the U.S. Capitol Police, rather than the U.S. Secret Service, restricted the Capitol Grounds that day, and (2) one of the Secret Service's protectees that day, former Vice President Mike Pence, was not "temporarily visiting" the

14

Capitol. ECF 205, 210:16.[4]

These are now well-trodden arguments in this district, having been raised and rejected consistently in similar cases arising from the Jan. 6 Capitol attack. For the following reasons, the Court should deny Blythe's and Randolph's motions here as well.

> **a.  Section 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction**

First, Blythe and Randolph assert that Counts Five, Six, and Seven, charging 18 U.S.C. §§ 1752(a)(1)–(2) and (b)(1)(A), should be dismissed for failure to state an offense because the U.S. Capitol Police, and not the Secret Service, designated the "restricted area" around the U.S. Capitol on Jan. 6, 2021. ECF 205:3; ECF 210:16. Nothing in the express language of Section 1752 requires this, and Defendants' attempts to read such a requirement as implied in the statutory language flies against the commensense reading of the text and its legislative history.

Section 1752 provides in relevant part:

(a)  Whoever—

> (1)  knowingly enters or remains in any restricted building or grounds without lawful authority to do so; [or]

> (2)  knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

---

4  Blythe filed a notice of intent to join ECF 205 and Grant moved to join both ECF 205 and ECF 210.  ECF 211, 212.

(c) In this section—

(1) [T]he term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting;

18 U.S.C. § 1752. Section 1752 also defines "restricted building or grounds" to include any posted, cordoned off, or otherwise restricted area "of the White House or its grounds, or the Vice President's official residence or its grounds" or "of a building or grounds so restricted in conjunction with an event designated as a special event of national significance." 18 U.S.C. §§ 1752(c)(1)(A), (C).

The language of Section 1752 contains no express requirement that the "restricted buildings or grounds" must be restricted by USSS for there to be a violation of Section 1752. Nonetheless, Blythe and Randolph argue that such a requirement is implicit in the statutory language, arguing that "[s]ince it is the Secret Service who protects the President or 'other person,' it is the Secret Service who must designate the area 'restricted.'" ECF 205:4; *see* ECF 210:17. However, because the plain language of the statute is clear and unambiguous, reading the implied requirement provided by Defendants is unwarranted. Even if one were to look beyond this plain language, the legislative history of Section 1752 also weighs against Defendants' interpretation.

First, there is no ambiguity in the text of Section 1752 as to the meaning of "restricted building or grounds." Namely, Section 1752 proscribes certain conduct in and around "any restricted building or grounds," *see* 18 U.S.C. § 1752(a), and it provides three definitions for the

16

term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting," § 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear—and Defendants do not appear to dispute—that "person[s] protected by the Secret Service" include the Vice President. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, § 1752(a)(1), and knowingly and with intent to impede or disrupt government business, engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" "government business," § 1752(a)(2).

In short, Section 1752 "prohibits persons from knowingly entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020). Where, as here, the words of the statute are unambiguous, "the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). However, under Defendants' interpretation of Section 1752, there is an additional, implied requirement unstated in the statutory language above that any restricted area must be designated by USSS. There is no such requirement, nor is there any credible rationale why one should be inferred.

And while looking beyond the plain language is unwarranted here, *see United States v. American Trucking Associations*, 310 U.S. 534, 543 (1940) (stating that looking beyond clear statutory text is appropriate where the results would be absurd or demonstrably at odds with

clearly expressed Congressional intent), the legislative history of Section 1752 in fact affirms the plain reading of the text that Defendants resist. As Blythe acknowledges, when Section 1752 was first enacted in 1970, USSS was part of the Treasury Department, and this original version of the statute explicitly incorporated regulations promulgated by the Treasury Department governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations). Specifically, subsection (d) of Section 1752 gave authority to Treasury, which oversaw USSS, to "prescribe regulations governing ingress or egress to such buildings and grounds and to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." Pub. L. 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971). However, when Congress revised Section 1752 in 2006, it struck subsection (d) from the statute, eliminating the requirement that "restricted building or grounds" be necessarily defined or designated by USSS or any other particular law enforcement agency. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006). In 2012, Congress further reinforced this interpretation by adding the definitional subsection (c) cited above, which provides the current definition of "restricted building or grounds" untethered from a determination by any particular agency. Pub. L 112-98, Title I, Sec. 2, 126 Stat 263 (March 8, 2012). Contrary to Defendants' reading, the legislative history shows that Congress deliberately excised any requirement that a restricted area depend on any definition or determination by USSS.

Both the plain language and legislative history of Section 1752 show that there is no requirement, express or implied, that an area be restricted by a particular law enforcement agency, as courts in this district have unanimously held. *United States v. Grider*, --- F.Supp.3d --

-, 2022 WL 3016775, at \*7 (D.D.C. July 29, 2022) (collecting cases) (internal quotations omitted) ("[N]othing in the statutory text requires the Secret Service to be the entity to restrict or cordon off a particular area, nor does Grider point to any provision in the statute in support of such a proposition."); *United States v. Bingert*, --- F.Supp.3d ---, 2022 WL 1659163, at \*14 (D.D.C. May 25, 2022) ("[D]efendants fashion a bizarre requirement, seemingly out of thin air: that only the Secret Service can designate an area as restricted [for the purposes of 18 U.S.C. § 1752]."). Defendants' contention that Counts Five, Six, and Seven are defective for this reason should be likewise rejected.

### b. Several Secret Service protectees were temporarily visiting the Capitol grounds on Jan. 6, 2021

Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). As the government intends to prove at trial, at the time of Defendants' relevant conduct on Capitol grounds on January 6, 2021, three Secret Service protectees—Vice President Pence and two immediate family members—were present. Defendants' conduct accordingly falls within the Section 1752's plain sweep when they entered the restricted area of the Capitol and assaulted law enforcement officers with a metal barricade while the Vice President and his family were "temporarily visiting."

Blythe and Randolph contend that the Section 1752 charges against them must be dismissed because the U.S. Capitol grounds on Jan. 6, 2021 were not "a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." ECF 210:18. In particular, they argue that because former Vice President Mike Pence lived and worked in the District of Columbia, and because he had an office inside the Capitol

19

building, he could therefore not be "temporarily visiting" the building or grounds for the purposes of Section 1752.

First, Defendants make no mention of Vice President Pence's two immediate family members—both USSS protectees—who were also with him that day. This makes any argument as to whether Vice President Pence was "temporarily visiting" a moot point. Regardless, the Court should reject Defendants' argument as meritless, as all others have,[5] as it defies Section 1752's plain terms, purpose, and structure.

As noted above, to determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). The verb "visit" means, *inter alia,* "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[6] Either definition describes the Secret Service protectees' activities on January 6. Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. Similarly, the Vice President's family members came to the U.S. Capitol for a particular purpose: to observe these proceedings. Finally, as President of the Senate, Vice President Pence oversaw the vote certification. Given the

---

[5] *E.g. United States v. Puma*, 2022 WL 823079, at *17 (D.D.C. Mar. 19, 2022) (rejecting same argument as "not supported by the statutory text and … out of step with the statutory context); *United States v. McHugh*, 583 F. Supp. 3d 1, 35 (D.D.C. 2022) ("None of McHugh's arguments about the meaning of 'temporarily visiting' sway the Court from the commonsense conclusion, founded on ordinary usage, dictionary definitions, and judicial interpretations, that Vice President Pence was 'temporarily visiting' the Capitol on January 6, 2021."); *United States v. Rodriguez*, No. CR 2 (ABJ), 2022 WL 3910580, at *16 (D.D.C. Aug. 31, 2022) ("This strained interpretation is inconsistent with both the text and the structure of the statute.").
[6] https://www.merriam-webster.com/dictionary/visit.

presence of the Vice President and his family members, the U.S. Capitol qualified as a building where "[a] person protected by the Secret Service [was] . . . temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

Defendants emphasize Section 1752's use of the term "temporarily," citing cases where the President or Vice President were "traveling outside of D.C., where they live and work, 'visiting' that area for a 'temporary' purpose." ECF 210:20. First, Section 1752 does not impose a requirement that the location being temporarily visited be outside of the District of Columbia. Second, Section 1752 does not require that the purpose of the visit be temporary, but that the nature of the visit itself be temporary. Vice President Pence and his family had traveled to the U.S. Capitol to oversee and attend the Joint Session of Congress—a proceeding of limited duration. At the close of the proceeding, they left—confirming the "temporary" nature of their visit.

Aside from a plain reading of the text, Defendants' interpretation of "temporarily visiting" would also leave a curious gap in Section 1752. The statute defines "restricted grounds" not only to include "a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting," but also to include "any posted, cordoned off, or otherwise restricted area . . . of the White House or its grounds, or the Vice President's official residence or its grounds." 18 U.S.C. 1752(c)(1)(A). It would be nonsensical to read Section 1752 as affording the Vice President protection at his official residence, on the White House grounds (where his offices were located),[7] and when he traveled outside Washington, D.C., but to carve

---

[7] *See United States v. McHugh*, 583 F. Supp. 3d 1, 35 (D.D.C. 2022) ("[T]he Vice President's working office is in the West Wing of the White House, and she also maintains a ceremonial office in the Eisenhower Executive Office Building."), *citing The Vice President's Residence &*

out a gap for areas that fall in between this definition. *United States v. Rodriguez*, 2022 WL 3910580, at *17 (D.D.C. Aug. 31, 2022) ("Defendant's reading of [Section 1752] would result in a large, entirely illogical gap in its coverage, and it is not supported by the text or by the application of common sense."). Indeed, under Defendants' proposed construction, Section 1752(c)(1)(B) would not apply where the President or Vice President temporarily stayed at their permanent residences in Delaware or California—on the view that such a trip would not qualify as "visiting." No support exists for Defendants' effort to insert such large and irrational exceptions into the statute's sweep. *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (noting that courts will avoid a "statutory outcome . . . if it defies rationality by rendering a statute nonsensical or superfluous or if it creates an outcome so contrary to perceived social values that Congress could not have intended it") (citation omitted).

Defendants offer two additional arguments—both irrelevant. First, Blythe notes that Vice President Pence "lived and worked" in the District of Columbia. ECF 210:19. But Section 1752(c)(1)(B) defines the restricted area by reference to "buildings or grounds," not municipal borders. That Vice President Pence lived and worked in Washington, D.C. does not detract from the fact that he "temporarily visit[ed]" the U.S. Capitol on January 6. Second, Defendants stress that Vice President Pence had a permanent U.S. Capitol office. *Id*. But Section 1752(c)(1)(B) defines the restricted area by reference to the location of the protectee—not his office. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building. And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]."

---

*Office*, https://www.whitehouse.gov/about-the-white-house/the-grounds/the-vice-presidents-residence-office/ (last accessed Jan. 31, 2022).

All told, Defendants' position defies Section 1752's clear purpose. In drafting Section 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. 1752(c)(1)(A); and also any other "building or grounds" where they happen to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B). All the relevant metrics—plain language, statutory structure, and congressional purpose—foreclose the defendant's crabbed reading of Section 1752(c)(1)(B). This Court should reject it.

III.     **Count Ten (18 U.S.C. § 1512(c)(2))**

Defendants Johnson (ECF 202), Samsel (ECF 208), and Blythe (ECF 210) have each moved to dismiss Count Ten, which charges all defendants with obstruction of an official proceeding.  Each defendant incorrectly argues that: 1) his conduct is not sufficient to establish an offense; 2) the proceeding addressed in Count Ten does not satisfy the statutory requirement for an "official proceeding;" and 3) Section 1512(c)(2) is unconstitutionally vague.  None of these arguments support relief for any of the defendants who raise them.[8]

Accordingly, most judges in this District have rejected the challenges the defendants raise

---

[8] Samsel filed a notice, ECF 209, of his intent to join Johnson's motion to dismiss Count Ten; Blythe filed a notice, ECF 211, of his intent to join Samsel's motion to dismiss Count Ten; and Grant filed a motion, ECF 212, to join Johnson's motion, Samsel's motion, and Blythe's motion to dismiss Count Ten.

in their motions.[9] *See, e.g.*, *United States v. Fitzsimons*, No. 21-cr-158,---F.Supp.3d---, 2022 WL 1698063, at *6-*12 (D.D.C. May 26, 2022) (Contreras, J.); *Bingert*, 2022 WL 1659163, at *7-*11 (Lamberth, J.); *United States v. Hale-Cusanelli*, No. 21-cr-37 (D.D.C. May 6, 2022) (McFadden, J.) (motion to dismiss hearing at pp. 4-8); *United States v. McHugh* (*McHugh II*), No. 21-cr-453, 2022 WL 1302880, at *2-*13 (D.D.C. May 2, 2022) (Bates, J.); *Puma*, 2022 WL 823079, at *12 n.4 (Friedman, J.); *United States v. Bozell*, No. 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.); *Grider*, 585 F.Supp.3d 21 (D.D.C. 2022) (Kollar-Kotelly, J.); *Nordean*, 579 F.Supp.3d 28 (D.D.C. 2021) (Kelly, J.); *Montgomery*, 578 F.Supp.3d 54, (D.D.C. 2021) (Moss, J.); *Mostofsky*, 579 F.Supp.3d 9 (D.D.C. 2021) (Boasberg, J.); *Caldwell*, 581 F.Supp.3d 1 (D.D.C. 2021) (Mehta, J.); *Sandlin*, 575 F.Supp.3d 16 (D.D.C. 2021) (Friedrich, J.).

### A.   The Defendant's Motion to Dismiss Count Ten of the Third Superseding Indictment, Alleging a Violation of 18 U.S.C. § 1512(c)(2), Lacks Merit

Count Ten of the Superseding Indictment charges the Defendants with corruptly obstructing, influencing, or impeding an "official proceeding," – *i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – in violation of 18 U.S.C. § 1512(c)(2). Count Ten states:

> On or about January 6, 2021, within the District of Columbia and elsewhere, **RYAN SAMSEL, JAMES TATE GRANT, PAUL RUSSELL JOHNSON, STEPHEN CHASE RANDOLPH,** and **JASON BENJAMIN BLYTHE,** along with others known and unknown to the Grand Jury, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3

---

9 Challenges based on the definition of an official proceeding and the alleged vagueness of Section 1512(c)(2) have been rejected unanimously.

U.S.C. §§ 15-18.

ECF 80:6.

In 2002, Congress enacted Section 1512(c)'s prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807. Section 1512(c)'s prohibition applies to:

> [w]hoever corruptly--
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so*.

18 U.S.C. § 1512(c) (emphasis added). Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). By the statute's plain terms, then, a person violates Section 1512(c)(2) when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here, Congress's certification of the Electoral College vote.

Notwithstanding the plain terms of the offense, the Defendants advance three arguments for the notion that Section 1512(c)(2) does not reach the conduct alleged in the indictment: (1) that the conduct the Defendants committed cannot qualify as conduct that "otherwise obstructs, influences, or impedes" the official proceeding; 2) that Congress's certification of the Electoral College vote is not an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2); and (3) that the statute is unconstitutionally vague itself and as applied to the Defendants. ECF 202:1-2 (Johnson); 208:1 (adopting ECF 202), 5, 11, 13 (Samsel); ECF 210:5-6, 8, 12 (Blythe). Their

claims lack merit.

With respect to these challenges, many judges of this District have considered, in other cases arising out of the events at the Capitol on January 6, 2021, one or more of the arguments the Defendants raise. *See, e.g., Bingert*, 2022 WL 1659163 at *2 n.3. Every district judge to have reached the issue has concluded that Congress's certification of the Electoral College is an "official proceeding" within the meaning of 18 U.S.C. 1512(c)(2) and that Section 1512(c)(2) is not unconstitutionally vague. In addition, every reported court of appeals decision to have considered the scope of Section 1512(c)(2), and all but one of the judges in this District to have considered the issue in cases involving January 6, 2021, have concluded that Section 1512(c)(2) prohibits obstruction regardless of its connection to documentary or tangible evidence. And, in any event, even if a nexus to documentary or tangible evidence were required, the allegations in the Superseding Indictment, which track the statutory language, adequately inform the Defendants about the charge against them; nothing more is required. *See, e.g.*, *United States v. Williamson*, 903 F.3d 124, 130-131 (D.C. Cir. 2018).

### 1.    Section 1512(c)(2) Applies to the Conduct Alleged in the Indictment.

The Defendants' primary argument rests upon Judge Nichols' decision in *United States v. Miller*, 589 F.Supp.3d 60 (D.D.C. 2022) and contends that the Defendants' conduct, like that of Miller, fails to fit within the scope of conduct prohibited by § 1512(c)(2). But *Miller* was wrongly decided,[10] and § 1512(c)(2) is "not limited by subsection (c)(1) – which refers to 'alter[ing], destroy[ing], mutilat[ing] or conceal[ing] a record, document, or other object'

---

[10] The United States is pursuing an appeal from the ruling in *Miller*. That appeal, docket number 22-3041, is fully briefed and the court of appeals has scheduled oral argument for December 12, 2022.

specifically." *United States v. Robertson*, --- F.Supp.3d ---, 2022 WL 2438546, *3 (D.D.C. July 5, 2022).[11]

#### a.   Section 1512(c)(2)'s text, structure, and history confirm that its prohibition covers obstructive conduct unrelated to documentary evidence.

In Section 1512(c)(2), Congress prohibited conduct that intentionally and wrongfully obstructs official proceedings. The ordinary meaning of "obstruct[], influence[], or impede[]" encompasses a range of conduct designed to frustrate an official proceeding. That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, or burning a building to conceal the bodies of murder victims. It also includes storming the Capitol to derail a congressional proceeding. A defendant who, acting with the necessary *mens rea*, obstructs Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2).

#### i.   Section 1512(c)'s text and structure confirm that Section 1512(c)(2) is not limited to document-related obstructive conduct

Section 1512(c)(2)'s plain text demonstrates that it prohibits any corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look first to the statutory language, "giving the words used their ordinary meaning." *Lawson v. FMR*

---

11 To support the effort to limit Section 1512(c)(2)'s reach to obstruction involving documentary evidence, Johnson quotes liberally from a 2018 memorandum from a former attorney general written when the author was a private citizen. ECF 202:2-5. The memorandum should have no bearing on this Court's determination of the Defendant's motion. It carries no authoritative or precedential weight; moreover, it was prepared more than two years before January 6, 2021 and did not address certification of the Electoral College vote. At least one judge in this district has discounted the memorandum's value, observing that "the memorandum was authored by William Barr before he was appointed to serve as Attorney General in the Trump Administration (and long after he served as Attorney General in the Bush Administration). Accordingly, any suggestion that the memorandum represents the views of the Department of Justice is inaccurate." *Montgomery*, 578 F.Supp.3d at 69 n.3.

*LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted). If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted). Here, the meaning of "obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.[12]

The verbs Congress selected in Section 1512(c)(2) are "noncontroversial." *Montgomery*, 578 F.Supp.3d at 70. The words "obstruct" and "impede" naturally "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries). Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on." *Influence*, Oxford English Dictionary, *available at* http://www.oed.com. These verbs plainly apply to obstructive conduct that otherwise might not fall within the definition of document or evidence destruction. *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013). When read with Section 1512(c)(2)'s subject ("whoever") and object ("any official proceeding"), those verbs prohibit a defendant "from coming in the way of, blocking, or holding up the business conducted by an official body, such as a court or the Congress, when that body has formally convened for the purpose of conducting that business." *Montgomery*, 578 F.Supp.3d at 70.

---

12 Samsel incorrectly seeks to rely on extraneous material outside the language of the statute with a quotation out of context from the "United States Attorneys' Manual" (which has been renamed). ECF 208:4. The internal policies of the Department of Justice, however, do not create enforceable rights for criminal defendants or private individuals. *E.g.*, *United States v. Mahdi*, 598 F.3d 883, 896-97 (D.C. Cir.), *cert. denied*, 562 U.S. 971 (2010); *United States v. Booth*, 673 F.2d 27, 30 (1st Cir.), *cert. denied*, 456 U.S. 972 (1982); *United States v. Schwartz*, 787 F.2d 257, 267 (7th Cir. 1986); *United States v. Wilson*, 614 F.2d 1224, 1227 (9th Cir. 1980); *United States v. Bagnell*, 679 F.2d 826, 832 (11th Cir. 1982). Its provisions are not law and do not bind this Court. *See also United States v. Caldwell*, 581 F.Supp. 1, 14 (D.D.C. 2021) (the Manual's generalized statements cannot alter the plain meaning of the statutory text).

Comparing the language in Section 1512(c)(1) to that in Section 1512(c)(2) confirms that the latter, unlike the former, is not a document-focused provision. Section 1512(c) consists of two provisions requiring the defendant to act "corruptly." Both contain a string of verbs followed by one or more direct objects. Section 1512(c)(1) applies to whoever corruptly "alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." The objects—"a record, document, or other object"—are static. In contrast, Section 1512(c)(2) applies to whoever corruptly "obstructs, influences, or impedes any official proceeding." The object— "proceeding"—is dynamic, and the verbs that precede it are all intended to change the movement or course of that "proceeding."  They are verbs that do not apply to a fixed "record" or "document" or an inanimate "object." The two sections are related through their connection to an official proceeding: Section 1512(c)(1)'s verbs target forms of evidence tampering (*e.g.*, altering, destroying mutilating) directed at the documents, records, and objects that are used in official proceedings, while Section 1512(c)(2)'s verbs take the proceeding itself as the object—thus prohibiting whatever conduct blocks or interferes with that proceeding without regard to whether that conduct involved documentary or tangible evidence.

Importing into Section 1512(c)(2) a nexus-to-documents requirement would not only require inserting an extratextual gloss, *see Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted), it would also render the verbs in Section 1512(c)(2) inapt. The *actus reus* that the verbs in Section 1512(c)(2) encompass is obstructing, influencing, and impeding. But "[h]ow [could] anyone [] alter, destroy, mutilate or conceal an 'official

29

proceeding' or how [could] anyone [] 'obstruct[], influence[], or impede[]' 'a record, document, or other object'?" *Montgomery*, 578 F.Supp.3d at 75; *accord Fitzsimons*, 2022 WL 1698063, at *12; *cf. Yates v. United States*, 574 U.S. 528, 551 (2015) (Alito, J., concurring) (rejecting interpretation of "tangible object" in Section 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon."). Such a mismatch is all the more unlikely given how readily Congress could have drafted language that supplies a nexus to documents in Section 1512(c)(2). *See Montgomery*, 578 F.Supp.3d at 73 (Congress could have enacted a prohibition that covers anyone who "'engages in conduct that otherwise impairs the integrity or availability of evidence or testimony for use in an official proceeding'").

The resemblance between the operative verbs in Section 1512(c)(2) and those Congress enacted in two other obstruction provisions, 18 U.S.C. §§ 1503(a) and 1505, demonstrates that Section 1512(c)(2) was designed to reach more than document-related obstructive conduct. Congress drafted the "omnibus clause" in Section 1503(a), which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] . . . the due administration of justice," to serve as a "catchall provision," *United States v. Aguilar*, 515 U.S. 593, 599 (1995), that criminalizes obstructive conduct that falls outside the narrower prohibitions within Section 1503(a) and neighboring provisions. *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-70 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d 910, 916-19 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-20 (8th

Cir. 1997) (instructing employee to remove documents from a house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-98 (9th Cir. 1982) (warning suspect about impending search warrant to prevent discovery of heroin). Section 1505, which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] . . . the due and proper administration of the law under which any pending proceeding is being had," has been construed to have a similar scope. *See, e.g.*, *United States v. Vastardis*, 19 F. 4th 573, 587 (3d Cir. 2021) (manipulating an oil content meter to produce an inaccurate reading during a Coast Guard inspection and making a related false statement). Like Section 1512(c)(2), Sections 1503(a) and 1505 do not include "any limitation on the nature of the obstructive act other than that it must be committed 'corruptly,'" which "gives rise to 'a fair inference' that 'Congress intended [Section 1512(c)(2)] to have a [broad scope].'" *McHugh*, 2022 WL 1302880, at *10 (quoting *Miller* at 114).

Consistent with the interpretation that obstructive behavior may violate Section 1512(c)(2) even where the defendant does not "take[] some action with respect to a document," *Miller* at 117, courts of appeals have upheld convictions under Section 1512(c)(2) for defendants who attempted to secure a false alibi witness while in jail for having stolen a vehicle, *United States v. Petruk*, 781 F.3d 438, 440, 447 (8th Cir. 2015); disclosed the identity of an undercover federal agent to thwart a grand jury investigation, *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009); lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *United States v. Volpendesto*, 746 F.3d 273,

31

286 (7th Cir. 2014); and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at \*6 (9th Cir. June 29, 2021) (unpublished); *see also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Interpreted correctly, Section 1512(c)(2) applies to the Defendants' conduct, which involved trespassing into the restricted Capitol area and interfering with law enforcement for the purpose of stopping the certification. In so doing, the Defendants hindered and delayed an "official proceeding" before Congress. *See* 18 U.S.C. § 1515(a)(1)(B). Because construing Section 1512(c)(2) to reach such conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

### ii. The term "otherwise" reinforces that Section 1512(c)(2) covers obstructive conduct "other" than the document destruction covered in Section 1512(c)(1).

The Defendants' textual analysis overlooks Section 1512(c)(2)'s verbs and focuses almost entirely on the term "otherwise." But that term, properly interpreted, does not support such a narrowed interpretation of Section 1512(c)(2).

The term "otherwise" means "in another way" or "in any other way." *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com. Consistent with its ordinary meaning, the term "otherwise" conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1) proscribes. *Burge*, 711 F.3d at 809; *Petruk*, 781 F.3d at 446-47 (noting that "otherwise" in

Section 151 2(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *United States v. Ring*, 628 F.Supp.2d 195, 224 n.17 (D.D.C. 2009) (noting that Section 1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1), and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering") *see also Gooch v. United States*, 297 U.S. 124, 126-28 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "'for ransom or reward or otherwise'" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C. § 2466(a)(1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court"). That reading follows inescapably from the text of Section 1512(c)'s two subsections read together: Section 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 2022 WL 823079, at *12, while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself," *Montgomery*, 2021 WL 6134591, at *12 (internal quotation marks omitted).

In this way, Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1)—obstruction of an official proceeding—when that result is accomplished by a different means, *i.e.*, by conduct *other* than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. §

1503(a), which criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catchall clause designed to capture other means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under Section 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *Volpendesto*, 746 F.3d at 286).

Contrary to Defendants' suggestion that Section 1512(c)(2) is untethered to Section 1512(c)(1), "otherwise" as used in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1). That understanding of "otherwise" is fully consistent with any reasonable definition of the term and does not render the term "surplusage."

This interpretation is not inconsistent with the canons of construction used in *Begay v. United States*, 553 U.S. 137 (2008) and *Yates v. United States*, 574 U.S. 528 (2015).  In considering whether driving under the influence was a "violent felony" for purposes of the Armed Career Criminal Act (ACCA)'s residual clause, which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury*," 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added), the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure than Section 1512(c)(2). *See Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"). Unlike in the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by

34

any limiting examples." *Ring*, 628 F.Supp.2d at 224 n.17. In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay*, "namely, the four example crimes," 553 U.S. at 147, is "absent" in Section 1512(c)(2). *Caldwell*, 2021 WL 6062718, at *14. Although Judge Nichols recognized the structural difference between the ACCA residual clause and Section 1512(c)(2), *see Miller* at 107-08, he offered no reason to import *Begay*'s interpretation of "otherwise" to Section 1512(c)(2)'s differently structured provision.

In fact, Section 1512(c)(2) is a poor fit for application of the *ejusdem generis* canon that *Begay* applied to the ACCA residual clause and that the Court functionally applied to Section 1512(c). "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category." *United States v. Espy*, 145 F.3d 1369, 1370-71 (D.C. Cir. 1998). In *Yates*, for example, the plurality and concurring opinions applied the *ejusdem generis* canon to interpret the word "tangible object" in 18 U.S.C. § 1519, which makes it a crime to "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence" an investigation. *See* 574 U.S. at 545-56 (plurality opinion); *id.* at 549-50 (Alito, J., concurring). But Section 1512(c)'s structure differs significantly: it includes one numbered provision that prohibits evidence-tampering, followed by a semi-colon, the disjunctive "or," and then a separately numbered provision containing the separate catchall obstruction prohibition. "The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). Furthermore, in the same way that the *ejusdem generis* canon does not apply to the omnibus clause in Section 1503

35

that is "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part), it has no application to Section 1512(c)(2), which embodies the same structure. *Cf. Loughrin v. United States*, 573 U.S. 351, 359 (2014) (distinguishing the mail fraud statute (18 U.S.C. § 1341), which "contains two phrases strung together in a single, unbroken sentence," from the bank fraud statute (18 U.S.C. § 1344), which comprises "two clauses" with "separate numbers, line breaks before, between, and after them, and equivalent indentation—thus placing the clauses visually on an equal footing and indicating that they have separate meanings"); *see also McHugh*, 2022 WL 1302880, at *5 (explaining that the *ejusdem generis* canon on which *Miller* relied is "irrelevant" because rather than the "'A, B, C, or otherwise D'" structure found in the ACCA residual clause, Section 1512(c) "follows the form '(1) A, B, C, or D; or (2) otherwise E, F, or G'").

Moreover, *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual clause covered only similar crimes. *Begay*, 553 U.S. at 142. Those examples, the majority reasoned, demonstrated that Section 924(e)(2)(B)(ii) was not designed "to be all encompassing," but instead to cover only "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id.* at 142-43. The majority next drew support for its conclusion from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" that would have covered offenses involving the substantial use of physical force and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-44. In the final paragraph of that section

of the opinion, the majority addressed "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "*sufficient* to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' *can* (we do not say *must* . . .) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144.

The majority's "remarkably agnostic" discussion of "otherwise" in *Begay*, which explicitly noted that the word may carry a different meaning where (as here) the statutory text and context indicates otherwise, *Montgomery*, at *11, suggests, if anything, that "*the government's* interpretation of 'otherwise' [in Section 1512(c)(2)] is the word's more natural reading," *McHugh*, 2022 WL 1302880, at *5 n.9; *see also Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" to mean "'in a different way or manner'" based on the discussion in *Begay*). In short, the majority in *Begay* "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 578 F.Supp.3d at 71.

Whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s holding and the subsequent interpretation of the ACCA residual clause demonstrate the central flaw with imposing an extratextual requirement within Section 1512(c)(2). The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompasses only crimes that, similar to the listed examples, involve "purposeful, 'violent,' and 'aggressive' conduct." 553 U.S. at 144-45. But "*Begay* did not succeed in bringing clarity to the meaning of the residual clause." *Johnson v. United States*, 576 U.S. 591, 600 (2015). Just as the *Begay* majority "engraft[ed]" the "purposeful, violent, and aggressive conduct" requirement onto the ACCA's residual clause, 553 U.S. at 150 (Scalia, J., concurring in judgment) (internal quotation marks omitted), so too would

37

the Defendants' proposed interpretation engraft onto Section 1512(c)(2) the requirement that a defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding. In the nearly 20 years since Congress enacted Section 1512(c)(2), no reported cases have adopted that interpretation, and for good reason. That interpretation would give rise to unnecessarily complex questions about what sort of conduct qualifies as "tak[ing] some action with respect to a document" in order to obstruct an official proceeding. *Cf. United States v. Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceeding[] through his conduct in relation to a tangible object").[13] In brief, Defendants' interpretation is likely to give rise to the very ambiguity it purports to avoid.

### iii.   Tools of statutory interpretation do not support the *Miller* Court's narrowed Interpretation

---

13 The Defendants' interpretation of Section 1512(c)(2) resembles the reading given in *Singleton* and *Hutcherson*, both of which are unpublished. As noted in the main text, no other court, at least in a reported opinion, appears to have adopted the nexus-to-tangible-evidence-or-a-tangible-object standard articulated in *Singleton* and *Hutcherson*. *See United States v. De Bruhl-Daniels*, 491 F.Supp.3d 237, 250-51 (S.D. Tex. 2020) (identifying *Singleton* and *Hutcherson* as outliers from the "most popular—and increasingly prevalent—interpretation of § 1512(c)(2) [as] an unlimited prohibition on obstructive behavior that extends beyond merely tampering with tangible items"); *Ring*, 628 F.Supp.2d at 225 n.18 (disagreeing with *Singleton* and *Hutcherson* but finding that the alleged conduct at issue in that case involved "some nexus to documents"). No court of appeals has cited either case.

Other tools of statutory construction reinforce the conclusion that Section 1512(c)(2) reaches conduct that obstructs or impedes an official proceeding in a manner other than through document destruction or evidence tampering.

Section 1512 is comprised of two parts: four subsections that define criminal offenses (Sections 1512(a)-(d)), followed by six subsections that provide generally applicable definitions and clarifications (Sections 1512(e)-(j)). [14] Within the first part, three subsections (Sections 1512(a)-(c)) define criminal offenses with statutory maxima of at least 20 years, *see* §§ 1512(a)(3), (b)(3), (c), while Section 1512(d) carries a three-year statutory maximum, § 1512(d). Within that structure, Congress sensibly placed Section 1512(c)(2) at the very end of the most serious—as measured by statutory maximum sentences—obstruction offenses, precisely where a "catchall" for obstructive conduct not covered by the more specific preceding provisions would be expected. In any event, the "mousehole" canon provides that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001), but it "has no relevance" where, as here, the statute in question was written in "broad terms," *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1753 (2020).

The Defendants' professed concern that a reading of Section 1512(c)(2) that encompasses obstructive conduct unrelated to documents would "swallow up" the remainder of Section 1512 (Br. 8) is unfounded. Overlap is "not uncommon in criminal statutes," *Loughrin*, 573 U.S. at 358 n.4, and Section 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause . . . serves as a catchall for matters not specifically

---

14 Section 1512 also includes one subsection, placed at the end, that adds a conspiracy offense applicable to any of the substantive offenses set out in Sections 1512(a)-(d). 18 U.S.C. § 1512(k).

contemplated." *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009). Moreover, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005).

Any overlap between Section 1512(c)(2) and other provisions in Section 1512 has a "simple" explanation that does not warrant the Court's narrowing construction. *McHugh*, 2022 WL 1302880, at *8. When Congress enacted the "direct obstruction" provision in Section 1512(c)(2), that provision necessarily included the "indirect obstruction prohibited" in the rest of Section 1512. *Id.* Congress in Section 1512(c)(2) therefore did not "*duplicate* pre-existing provisions . . . but instead *expanded* the statute to include additional forms of obstructive conduct, necessarily creating overlap with the section's other, narrower prohibitions." *Id.* Congress was not required to repeal those pre-existing prohibitions and rewrite Section 1512 "to create a single, blanket obstruction offense" just to avoid overlap. *Id.* at *9. "Redundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54. In other words, Section 1512(c)(2) "creates only explicable and indeed inevitable overlap rather than outright redundancy," such that the "purported superfluity" in Section 1512 "simply does not justify displacing the provision's ordinary meaning." *McHugh*, 2022 WL 1302880, at *10. That is particularly so here because even a "broad interpretation of § 1512(c)(2) does not entirely subsume numerous provisions within the chapter," and any overlap with other provisions in Section 1512 is "hardly remarkable." *Sandlin*, 575 F.Supp.3d at 27; *accord Nordean*, 579 F.Supp.3d at 46.

40

Notably, the Defendants' interpretation injects a more troubling type of superfluity. Construing Section 1512(c)(2) to require some action with respect to a document risks rendering Section 1512(c)(2) itself superfluous in light of the "broad ban on evidence-spoliation" in Section 1512(c)(1). *Yates*, 574 U.S. at 541 n.4 (plurality opinion) (internal quotation marks omitted); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting the catchall provision in Section 1503(a)'s omnibus clause to obstructive acts "directed against individuals" would render the omnibus clause superfluous because "earlier, specific[] prohibitions" in Section 1503(a) "pretty well exhaust such possibilities") (internal quotation marks omitted). The canon against surplusage is "strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). It is even stronger here, when it would render superfluous "other provisions in the *same enactment*"—namely, the Sarbanes-Oxley Act. *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (emphasis added; internal quotation marks omitted). At a minimum, the canon does not militate in favor of the defendant's reading. *See United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013) (canon against surplusage "'merely favors that interpretation which avoids surplusage,' not the construction substituting one instance of superfluous language for another").

Finally, an interpretation of Section 1512(c)(2) that imposes criminal liability only when an individual takes direct action "with respect to a document, record, or other object" to obstruct a qualifying proceeding leads to absurd results. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (rejecting interpretation of a criminal statute that would "produce results that were not merely odd, but positively absurd"). That interpretation would appear, for example, not to encompass an individual who seeks to "obstruct[], influence[], or impede[]" a congressional

41

proceeding by explicitly stating that he intends to stop the legislators from performing their constitutional and statutory duties to certify the Electoral College vote results by dragging lawmakers out of the Capitol and leading a mob to charge toward federal officers, pushing them aside to break into the Capitol, unless he also picked up a "document or record" related to the proceeding during that violent attack. The statutory text does not require such a counterintuitive result.

In short, if Congress in Section 1512(c)(2) endeavored to create the narrow document-focused provision that the Court envisioned, it "did a particularly poor job of drafting" because Congress would have "effectuated [its] intent in a way that is singularly susceptible to misinterpretation, as evidenced by the overwhelming majority of judges who have construed § 1512(c)(2) broadly." *McHugh*, 2022 WL 1302880, at *11. In accordance with those judges, the Court should reject the Defendants' atextual, narrowed interpretation.

### iv. **Legislative history does not support the Miller Court's narrowed interpretation.**

Because "the statutory language provides a clear answer," the construction of Section 1512(c)(2) "ends there," and resort to legislative history is unnecessary. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). Regardless, the legislative history of Section 1512(c)(2)— particularly when considered alongside the history of Section 1512 more generally—does not support the Defendants' interpretation of Section 1512(c)(2) for two reasons.

First, Section 1512(c) aimed at closing a "loophole" in Section 1512: the existing prohibitions did not adequately cover a defendant's *personal* obstructive conduct *not* aimed at another person. *See* 148 Cong. Rec. S6550 (statement of Sen. Hatch). To close that loophole, Section 1512(c)(1) criminalizes a defendant's firsthand destruction of evidence (without having

to prove that the defendant induced another person to destroy evidence) in relation to an official proceeding, and Section 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that *otherwise* impedes or influences an official proceeding (though not necessarily through another person). *See Burge*, 711 F.3d at 809-10. The Defendants' limiting construction undermines Congress's efforts at loophole closing.

Second, no substantive inference is reasonably drawn from the fact that the title of Section 1512 does not precisely match the "broad proscription" it in fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in Section 1512(c), "Tampering with a record *or* otherwise impeding an official proceeding." Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered). Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in Section 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

And while the legislators who enacted Section 1512(c) in the Sarbanes-Oxley Act undoubtedly had document shredding foremost in mind, "it is unlikely that Congress was concerned with only the type of document destruction at issue in the *Arthur Andersen* case." *Montgomery*, 578 F.Supp.3d at 77. In other words, "there is no reason to believe that Congress intended to fix that problem only with respect to 'the availability or integrity of evidence.'" *Id.* In addition, if the Defendants' narrow interpretation were correct, then certain floor statements, such as Senator Hatch's description of Section 1512(c)'s purpose to strengthen an obstruction offense "often used to prosecute document shredding *and other forms of obstruction of justice*,"

43

148 Cong. Rec. S6550 (emphasis added), "would be quite strange." *McHugh*, 2022 WL 1302880, at *12.

### v.  Even if Section 1512(c)(2) required that the obstructive act relate to documentary evidence, the Defendants' conduct would be covered

Neither ordinary methods of statutory construction nor the rule of lenity supports limiting to Section 1512(c)(2) to document-based obstructive conduct. But even if Section 1512(c)(2) were so limited, it necessarily reaches beyond the direct evidence tampering already covered by Section 1512(c)(1) to include alternative ways of interfering with the consideration of documentary evidence—as happened here when the Defendant impeded lawmakers' consideration of documents and records at the Electoral College vote certification proceeding.

At a minimum, Section 1512(c)(2) covers conduct that prevents the examination of documents, records, and other nontestimonial evidence in connection with an official proceeding. Even assuming a focus on documentary evidence, the additional conduct that it would cover beyond Section 1512(c)(1) would include, for example, corruptly blocking the vehicle carrying the Electoral College vote certificates to the Capitol for congressional examination at the certification proceeding, which would not "alter[], destroy[], mutilate[], or conceal[]" that evidence under 1512(c)(1), but would plainly "obstruct[]" or "impede[]" the proceeding with respect to that evidence under Section 1512(c)(2). For similar reasons, Section 1512(c)(2) would likewise cover blocking a bus carrying lawmakers to the Capitol to examine the certificates at the certification proceeding. And it just as readily covers displacing lawmakers from the House and Senate Chambers, where they would examine and discuss those certificates and other records.

The Electoral College vote certification is rooted in constitutional and federal statutory law that requires the creation and consideration of various documents, and that certification

44

operates through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections. Had the Defendants sought to alter or destroy any of those documents, they would have violated Section 1512(c)(1). Here, the Defendants allegedly sought to stop Members of Congress from reviewing those constitutionally and statutorily mandated documents at a proceeding to certify the results of the 2020 presidential election. Thus even if a violation of Section 1512(c)(2) covered only obstructive behavior that prevents the consideration of documents, records, or other objects at an official proceeding, the Defendants' alleged conduct—corruptly obstructing and impeding the examination of physical or documentary evidence at a congressional proceeding—states an offense.

## 2. The certification of the Electoral College vote is an official proceeding

The Defendants contend that the Electoral College certification before Congress does not constitute an "official proceeding" under 18 U.S.C. 1512(c)(2).  They argue that the term "official proceeding" refers to "tribunal-like proceedings before Congress related to the administration of justice" and that certification of the Electoral College, lacking those features, falls outside the scope of 1512. ECF 202 at 1 (Johnson); *see also* ECF 210 at 6 (Blythe). This argument lacks merit and judges in this district have consistently rejected it, including in *Miller*, 589 F.Supp.3d at 66-67; *see also United States v. Rodriguez*, 21-cr-0246 (ABJ), 2022 WL 3910580 at *3-4 (D.D.C. Aug. 31, 2022); *Puma*, 2022 WL 823079, at *10; *Bingert*, 2022 WL 1659163 at *4; *United States v. Robertson*, 588 F.Supp.3d 114, 120-22 (D.D.C. 2022)  The same result is warranted here.

### a. The plain text of the statute establishes that the Joint Session is an Official Proceeding

### i. Background

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote.  Two separate provisions in the Constitution mandate that the Vice President while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII.  Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15.  Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id.*  The President of the Senate is empowered to "preserve order" during the Joint Session.  3 U.S.C. § 18.  Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once."  3 U.S.C. § 17.  The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared."  3 U.S.C. § 16.

The obstruction statute with which the Defendants are charged prohibits corruptly obstructing, influencing, or impeding any official proceeding.  18 U.S.C. § 1512(c)(2).  An official proceeding for purposes of § 1512(c)(2) is defined as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of

Federal Claims, or a Federal grand jury;

(B) *a proceeding before the Congress*;

(C) a proceeding before a Federal Government agency which is authorized by law; or

(D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

18 U.S.C. § 1515(a)(1) (emphasis added).

### ii. Certification of the Electoral College vote is a proceeding before the Congress

The certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). That conclusion flows principally from the obstruction statute's plain text. Skipping past the text, the Defendants argue that Congress' certification of the Electoral college is a "ceremonial meeting" that decides "nothing." ECF 202:13 (Johnson); *see also* ECF 210:7-8 (Blythe) (certification is a ceremonial and administrative event). As this Court noted in *Puma,* the logic behind this argument is "flawed". *Puma*, 2022 WL 823079, at *11.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding." *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013). The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting *Proceeding,* Oxford English Dictionary, *available*

*at* http://www.oed.com).  The Defendants do not meaningfully contend that the certification of the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding—and indeed an official proceeding—under that broad definition.  And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly.  Section 1515's text encompasses not only congressional proceedings, but judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies, and proceedings "involving the business of insurance."  18 U.S.C. § 1515(a)(1); *see* S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs Section 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification qualifies.  This narrower definition includes the "business conducted by a court or other official body; a hearing."  Black's Law Dictionary, "proceeding" (11th ed. 2019).  Taken with its modifier "official," the term proceeding thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512").  For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515 courts analyze the degree of formality involved in an investigation.  *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal investigation

conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol not an "official proceeding" because that term *"*contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added).

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *See Perez*, 575 F.3d at 169. Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for the certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1 pm on the January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, *supra*. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a

courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform").   The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until the "the count of electoral votes" is "completed," and the "result declared." *Id.*  In short, the certification of the Electoral College vote is a "proceeding before the Congress."   *See* 18 U.S.C. § 1515(a)(1)(B).

Johnson relies heavily on *United States v. Guertin,* 1:21-Cr-262 (TNM), 2022 WL 203467 (D.D.C. Jan. 24, 2022) to advance his narrow reading of what constitutes an "official proceeding" under 1512.  *See* ECF 202:9-13 .  *Guertin* addressed whether "an informal, routine agency action like clearance-adjudication" qualified as an "official proceeding" under § 1512. *Id.* at *97.  In holding that the clearance-adjudication in *Guertin* was not a "official proceeding" Judge McFadden noted that it involved "a single, low-level bureaucrat issuing a routine certification." *Id.* at 98. This type of informal bureaucratic action is not comparable to the Constitutionally and statutorily mandated certification of the Electoral College vote. Rather, the type of routine background check described in *Guertin* is more akin to the law enforcement investigations described in *Ermoian* and *Perez.* It is also telling that the same judge, Judge McFadden, who decided *Guertin,* rejected the argument that the certification of the Electoral college was not an official proceeding. *See e.g.*, *Hale-Cusanelli*, No. 21-cr-37 (D.D.C. May 6, 2022) *supra*.

### 3.   Section 1512(c)(2) Is Not Unconstitutionally Vague.

Next, the Defendants contend that Section 1512(c)(2) is unconstitutionally vague. As every judge in this District to have considered the issue has concluded, they are incorrect.

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). A provision is impermissibly

vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

The Defendants have not overcome the "strong presumpti[on]" that Section 1512(c)(2) is constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

The Defendants' claim that the word "corruptly" in Section 1512(c)(2) is unconstitutionally vague is incorrect. As Judge Friedman recently observed, "[j]udges in this

district have construed 'corruptly' to require 'a showing of "dishonesty" or an 'improper purpose'[;], 'consciousness of wrongdoing'[;] or conduct that is 'independently criminal,' 'inherently malign, and committed with the intent to obstruct an official proceeding.'" *Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, 578 F.Supp.3d at 81); *Bozell*, 2022 WL 474144, at *6; *Caldwell*, 581 F.Supp.3d at *19; and *Sandlin*, 575 F.Supp.3d at 33 (alterations omitted). Under any of these common-sense constructions, the term "corruptly" "not only clearly identifies the conduct it punishes; it also 'acts to shield those who engage in lawful, innocent conduct – even when done with the intent to obstruct, impede, or influence the official proceeding.'" *Id.* (quoting *Sandlin*, 575 F.Supp.3d at 33). It presents no vagueness concern.

Nor does *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), support Defendants' attacks on the word "corruptly," for at least three reasons. First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id*. at 629-30. Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g.*, *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). The Defendants'

53

invocation of *Poindexter* accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id*. at 705 (citation omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502. Third, and as noted above, courts have encountered little difficulty when addressing "corruptly" in Section 1512(c)(2) following *Arthur Andersen. See Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, at 81); *Bozell*, 2022 WL 474144, at *6; *Caldwell*, 581 F.Supp.3d at 19; and *Sandlin*, 575 F.Supp.3d at 32-33 (alterations omitted). Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.[15]

Samsel is incorrect to suggest (ECF 208:15) that various cases that have defined "corruptly" to include the "administration of justice" support his vagueness claim.  That other courts have used the phrase "administration of justice" in Section 1512(c)(2) cases where the underlying facts involved efforts to obstruct grand jury investigations does not demonstrate that the term "corruptly" fails to provide adequate notice or invites arbitrary enforcement.  *See Johnson*, 576 U.S. at 595.  In any event, many of those cases appear simply to have borrowed language from or a pattern jury instruction designed for 18 U.S.C. § 1503, which does include the phrase.  *See United States v. Reffitt*, No. 21-cr-32 (DLF), ---F.Supp.3d---, 2022 WL 1404247

---

[15] Blythe appears to argue that his inability to understand certain charging decisions supports a vagueness claim.  ECF 210:12.  The argument is meritless.  *E.g., Puma*, 2022 WL 823079 at *13 ("[d]iscretionary prosecutorial decisions cannot render vague as applied a statute that by its plain terms provides fair notice")(and cases cited therein).

at*6 (D.D.C. May 4, 2022); *Fitzsimons*, 2022 WL 1698063 at *6 (explicitly declining to follow Seventh Circuit pattern jury instructions that define corruptly to relate solely to the administration of justice for purposes of Section 1512(c)); *Montgomery*, 571 F.Supp.3d at 84 (finding text did not support the argument linking corrupt intent to the due administration of justice); *United States v. Robertson*, 21-cr-34 (CRC), ---F.Supp.3d ---, 2022 WL 2438546 at *1 (D.D.C. July 5, 2022)("there is no 'due administration of justice' element in § 1512(c)").

**B.  The rule of lenity does not apply.**

Text, structure, history, and other tools of statutory interpretation unambiguously demonstrate that Section 1512(c)(2) prohibits any conduct that obstructs or impedes an official proceeding, and the *mens rea* and nexus requirements ensure that the provision does not ensnare conduct that is "not inherently malign." *Arthur Andersen*, 544 U.S. at 704. Accordingly, the rule of lenity has no role to play.

"When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83 (1955). That principle underlies the "venerable rule of lenity," *United States v. R.L.C.*, 503 U.S. 291, 305 (1992) (opinion of Souter, J.), which ensures that "legislatures and not courts" define criminal activity given the "seriousness of criminal penalties" and the fact that "criminal punishment usually represents the moral condemnation of the community." *United States v. Bass*, 404 U.S. 336, 348 (1971); *see Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

The rule of lenity does not come into play when a law merely contains some degree of ambiguity or is difficult to decipher. The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019). In short, some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted). "Properly applied, the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'" *Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

Simply put, the rule of lenity is "inapplicable" here. *Puma*, 2022 WL 823079, at \*26. Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings—regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction between these forms of obstruction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens those conducting that proceeding escapes criminal liability under the statute. Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. *See Wooden*, 142 S. Ct. at

56

1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."). It would strain credulity for any defendant who was focused on stopping an official proceeding through unlawful means to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." 18 U.S.C. § 1512(c)(2).

### C.   Count Ten Is Sufficiently Specific

Samsel protests that the allegations in Count Ten lack sufficient detail.[16]  He does not dispute, however, that the language of Count Ten tracks the language of Section 1512(c)(2), the statute that it charges.  Thus, the same analysis as that applied above in Section I (addressing the specificity needed for Count One, *see* pp. 5-9) applies here.  The validity of Count Ten does not depend on whether it could have been more definite and certain.  *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). An indictment is sufficient if it "first . . . contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Resendiz-Ponce*, 549 U.S. at 108 (cleaned up) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

The indictment should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007). Only in the rare case where "guilt depends so crucially upon . . . a

---

16 In places, his complaints are difficult to follow.  For example, he alleges that the indictment contains 52 other counts relating to 8 other defendants.  ECF 208:20.  In fact, the indictment charges a total of 5 defendants and contains a total of 14 counts. Regardless of the actual number of counts or defendants, the significance of either quantity is unexplained.

specific identification of fact" not included in the statutory language will an indictment that restates the statute's language be insufficient. *Haldeman*, 559 F.2d at 125 (quoting *Russell v. United States*, 369 U.S. 749, 764 (1962)).

Like Count One, Count Ten is more specific then the offense charged in *Apodaca*, cited above. Like Count One, it notifies the defendants of the exact day on which the alleged crime occurred: January 6, 2021. It identifies the specific proceeding allegedly obstructed, namely, Congress' certification of the Electoral College vote. It cites the provisions of statutes and the Constitution that mandate the certification and the manner of its execution. And Count Ten tracks the language of Section 1512. Accordingly, Count Ten is sufficiently specific notwithstanding Samsel's demand for details not required under the Constitution, the Federal Rules of Criminal Procedure, or this district's precedent.

Samsel frames his objection to the lack of specificity as a claim that Count Ten does not allege an "actus reus". His claim is incorrect. Obstructing, impeding, and influencing form the "actus reus" of Section 1512(c)(2). *McHugh*, 2022 WL 1302880 at *10; *Caldwell*, 581 F.Supp.3d at 21 (the *actus reus* elements of Section 1512(c)(2) are broad, but give a defendant fair notice fair warning in plain language that a crime will occur if the defendant obstructs, impedes or influences an official proceeding), at 30 (these *actus reus* elements are not ambiguous). Count Ten alleges that the Defendants obstructed, impeded and influenced an official proceeding. Therefore, Samsel's claim that this count lacks an *actus reus* is simply wrong. He provides no authority addressing Section 1512(c)(2) to support his claim that more detailed allegations are required, and the United States is aware of none. This Court should accordingly reject his claim that greater specificity is needed, and deny the application to dismiss

58

Count Ten.

## **CONCLUSION**

For the foregoing reasons, the government respectfully submits that the Defendants' motions to dismiss Counts One, Five, Six, Seven, and Ten of the Third Superseding Indictment should be denied. ECF 204, 205, 208, 210.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Karen Rochlin*
KAREN ROCHLIN
DC Bar No. 394447
Assistant United States Attorney Detailee
U.S. Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045

CHRISTOPHER BRUNWIN
California Bar No. 158939
Assistant United States Attorney Detailee
U.S. Attorney's Office
Central District of California
312 N. Spring Street
Los Angeles, California 90012
(213) 894-4242
christopher.brunwin@usdoj.gov

JOSEPH HUTTON MARSHALL
D.C. Bar No. 1721890
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20005
(202) 252-6299
Joseph.hutton.marshall@usdoj.gov

59