UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>RYAN SAMSEL, *et al.*,<br><br>Defendants. | Crim No. 21-cr-537 (JMC) |

## ORDER

The five Defendants in this case are charged with crimes related to the events that occurred on January 6, 2021. Defendants moved for a change of venue, arguing that the jury pool in the District of Columbia is biased against them. The Court denies the Motion.[1]

**I.   BACKGROUND**

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election. ECF 1-1 at 1. A large crowd gathered outside the U.S. Capitol during the joint session. *Id.* Barricades had been set up around the exterior of the U.S. Capitol building, and U.S. Capitol Police monitored the situation. *Id.*

Around 1:30 PM, the House and Senate adjourned to separate chambers to resolve an objection. *Id.* About thirty minutes later, the crowd pushed past the barriers, assaulted members of the U.S. Capitol Police, and entered the U.S. Capitol building. *Id.* Members of the House and

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

1

Senate, as well as Vice President Mike Pence, were quickly evacuated. *Id.* The joint session of Congress was paused until later that night. *Id.*

The Government alleges that the five Defendants in this case—Ryan Samsel, James Tate Grant, Paul Russell Johnson, Stephen Chase Randolph, and Jason Benjamin Blythe—were involved in the events of January 6, 2021. *See* ECF 80 (Third Superseding Indictment). They were each charged with multiple offenses, though the specific charges differ for each Defendant. *See id.*

On October 28, 2022, Johnson filed a Motion to Change Venue. ECF 203. Johnson's co-defendants joined his Motion. *See* ECF 207 (Randolph); 209 (Samsel); 211 (Blythe); 212 (Grant). The Government filed an Opposition on November 18, 2022. ECF 218.

## II.     LEGAL STANDARD

The Sixth Amendment guarantees criminal defendants the right to a trial "by an impartial jury of the State and district wherein the crime [was allegedly] committed." U.S. Const. amend. VI. Article III states that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes [were allegedly] committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed," U.S. Const. art. III, § 2, cl. 3.

The Federal Rules of Criminal Procedure implement the Constitution's venue considerations, stating that "the government must prosecute an offense in a district where the offense was committed" unless another rule or statute says otherwise. Fed. R. Crim. P. 18. One such exception is found in Fed. R. Crim. P. 21(a), which requires a court to transfer a criminal case to another district "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Transferring a criminal case does not offend the Constitution's place-of-trial prescriptions if it is necessary to ensure the defendant receives a fair trial. *See, e.g.*, *Rideau v. State of La.*, 373 U.S.

723, 727 (1963) (holding that the trial court's denial of a transfer motion violated the defendant's due process rights).

Criminal defendants must ordinarily demonstrate that they were denied a fair trial "by reference to the voir dire." *United States v. Haldeman*, 559 F.2d 31, 60 (D.C. Cir. 1976). But in "extreme circumstances," courts may presume the existence of prejudice against the defendant. *Id.* In *Skilling v. United States*, the Supreme Court outlined a multifactor test for determining when prejudice may be presumed. 561 U.S. 358 (2010). The relevant factors include the size and characteristics of the community in which the crime occurred; whether pretrial publicity was so memorable and inflammatory that jurors "could not reasonably be expected to shut [it] from sight;" and the amount of time between the commission of the crime and commencement of trial.[2] *Id.* at 382–83.

### III. ANALYSIS

Defendants argue that all three *Skilling* factors support a presumption of prejudice in this case. ECF 203 at 3. They lean on two statistical studies conducted by private organizations hired to assess the impartiality of District residents. *See* ECF 203-1 (study conducted by Select Litigation); ECF 209-1 (study conducted by In Lux Research). However, after analyzing each of the factors, the Court concludes that a presumption of prejudice is not warranted and therefore declines to grant Defendants' Motion to Change Venue.

#### A. Size and Characteristics of the Community

Regarding the first *Skilling* factor, Defendants argue that three characteristics of the District of Columbia—the District's size, the significant number of District residents who work for the

---

[2] The Supreme Court noted a fourth factor that is relevant only on appeal: whether the jurors' actions—including their final verdict—supported or undercut the presumption of prejudice. *Skilling*, 561 U.S. at 383–84. Because this case is not on appeal, this last factor is not relevant to this Court's analysis.

3

government, and the population's experience of living in the aftermath of January 6—support a presumption of prejudice in this case. Defendants also claim that statistical studies show District residents are more biased against them than people from other jurisdictions.

At 700,000 residents,[3] the size of the District of Columbia does not support a presumption of prejudice. The Court has found a presumption of prejudice in cases involving communities of 30,000 and 150,000 people, *Irvin v. Dowd*, 366 U.S. 717, 719 (1961); *Rideau*, 373 U.S. at 724, but it has declined to do so where the jury was pulled from larger populations, *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (approximately 180,000 people); *Skilling*, 561 U.S. at 382 (4,500,000 people); *see also Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (finding the "likelihood of prejudice" to be reduced in part because the community held 600,000 people). While the population of the District of Columbia does not match the size of the community in *Skilling*, the District is still one of the larger cities in the United States. Accepting Defendants' argument would support a presumption of impartiality in all but the largest metropolitan areas. That proposition is inconsistent with the principle that a presumption of prejudice should be found only in "extreme case[s]." *Skilling*, 561 U.S. at 381.

Defendants' reference to the high percentage of District residents who work for the federal government is similarly unavailing. Defendants argue that federal employees "are more likely to view themselves as direct victims of the events," ECF 203 at 6, presumably because the Defendants are charged with crimes involving the federal government. *See* ECF 80 (charging Defendants with Disorderly Conduct in a Capitol Building or Grounds, among other offenses). In this respect, this case resembles *United States v. Haldeman*, the notable case involving the Watergate scandal. 559

---

[3] U.S. Census Bureau, QuickFacts, District of Columbia (2021), https://www.census.gov/quickfacts/DC (last visited Dec. 13, 2022).

F.2d 31 (D.C. Cir. 1976). *Haldeman*, like this case, was prosecuted in the District of Columbia, and involved alleged crimes against the federal government. *Id.* at 51. The D.C. Circuit affirmed the trial court's denial of a pre-voir dire request for change of venue. *Id.* at 63–64. *Haldeman*'s holding suggests that District residents are not presumed to be biased, even in cases involving the federal government. This comports with *Skilling*'s assessment of the impact that the Enron scandal inflicted upon the local community: there, the "sheer number of victims" in the community did not trigger a presumption of prejudice. 561 U.S. at 384.

For much the same reason, the experience of living in the aftermath of January 6 also lends insufficient support toward a presumption of prejudice. Many other courts have declined requests to change venue despite the jury pool having likely felt the effects of calamitous and tragic events. *See, e.g.*, *In re Tsarnaev*, 780 F.3d 14, 21–23 (1st Cir. 2015) (Boston Marathon bomber); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 bombing of the World Trade Center).

Through their statistical studies, Defendants purport to show that District residents are intractably biased against Defendants. ECF 203 at 15–17. They claim that District residents are "far more likely" to prejudge Defendants as guilty than people from Florida, North Carolina, Virginia, and Georgia. *Id.* at 16. To be sure, some data points in the cited studies raise concerns that must be addressed in voir dire: for example, jurors incapable of applying the "innocent until proven guilty" standard will have to be identified and dismissed. *See* ECF 203-1 at 3. But voir dire—conducted according to well-established procedures and in the presence of all parties—is adept at revealing biased individuals and plucking them out of the jury box. *See Haldeman*, 559 F.2d at 64 n.43 (finding that the trial court did not abuse its discretion in relying on voir dire instead of surveys submitted by one party); *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)

(discussing the "critical function" that voir dire plays in upholding defendants' Sixth Amendment right to an impartial jury).

Although there are some competing considerations in the first *Skilling* factor, it does not demonstrably favor of transfer. Additionally, voir dire can alleviate many of the concerns implicated by the first factor.

### B. Characteristics of the Pretrial Publicity

Defendants also argue that ongoing media coverage discussing the events of January 6 weighs in favor of a presumption of prejudice. Most of the media coverage highlighted by Defendants reaches a national audience. *See* ECF 203 at 9–11. District residents are not affected by this nationwide publicity differently than citizens of other jurisdictions. Therefore, with regards to coverage by national media outlets, it is questionable whether a change in venue would be useful because the jury pool in the transferee district would consume the same publicity. *See Haldeman*, 559 F.2d at 64 n.43 (noting that "a change of venue would have . . . only doubtful value" where publicity covers crimes involving the federal government).

Defendants' statistical studies suggest that media outlets in the District of Columbia have covered the events of January 6 more extensively than local news outlets in other jurisdictions. *See* ECF 203-1 at 8–10. But greater publicity does not inevitably prejudice a jury pool. Courts do not grant a change of venue because the jury pool has become aware of the alleged crimes at issue; they transfer cases only if extreme circumstances indicate that a jury pool would be incapable of setting aside their preconceptions and unable to render a verdict based on the evidence presented at trial. *See Skilling*, 561 U.S. at 380–81; *Haldeman*, 559 F.2d at 62.

The pretrial publicity in *Rideau v. Louisiana* exemplifies such a situation. There, on three separate occasions in the weeks leading up to trial, a local television station broadcast the defendant confessing that he committed the crime. 373 U.S. at 724. The Court found that a jury "could not

6

reasonably be expected to shut from sight" this type of "smoking-gun" evidence, and held that due process demanded transfer of Rideau's case. *Id.* at 726; *see also Skilling*, 561 U.S. at 382–83. While Defendants have provided some evidence that District residents were exposed to more publicity, they have not shown that the nature of that publicity could prejudice viewers in the same way that Rideau's confession did. Therefore, the second factor does not favor transfer.

### C. Amount of Time Between the Crime and Trial

Finally, Defendants argue that the persistent media attention in the two years since the alleged crimes took place keeps the events "fresh in prospective jurors' minds." ECF 203 at 13. But Defendants' arguments miss the concerns implicated by the third *Skilling* factor. Because "juror impartiality . . . does not require ignorance," *Skilling*, 561 at 381, the issue is not whether potential jurors remember the events, but whether the trial follows so closely on the heels of a notorious crime that the jury's factfinding would be clouded by emotional reflex. In *Skilling*, the Court found that a four-year gap between the alleged crime and the defendant's trial diminished the likelihood of bias. *Id.* at 383. While the two-year interval in this case does not match *Skilling*'s four-year gap, it still lessens the force of instant reactions to a widely publicized crime. Additionally, like the second *Skilling* factor, a change in venue would have questionable benefit with regards to the third factor. The national media coverage has kept the events of January 6 in the minds of all Americans, not just District residents. Therefore, the third *Skilling* factor also does not favor change of venue.

### D. Analyzing the Factors Together

This case, like others involving the events of January 6, has attracted significant media attention. To that point, Defendants have put forth evidence showing that most District residents remember the events of January 6 and retain some feelings about that day. But "pretrial publicity— even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Skilling*, 561 U.S.

7

at 384 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)). Any case of notoriety will attract interest, and reasonably intelligent people can be expected to generate some impression about it. *See Reynolds v. United* States, 98 U.S. 145, 155–56 (1879); *Irvin*, 366 U.S. at 722–23. The relevant question is whether it is possible to find twelve jurors capable of setting aside those opinions and deciding the case based on the evidence presented at trial. *See Skilling*, 561 U.S. at 398–99 (citing *Irvin*, 366 U.S. at 723); *Haldeman*, 559 F.2d at 62.

Even in high-profile cases, voir dire is "well suited" to the task of identifying biased jurors. *Skilling*, 561 U.S. at 384. The process can be adjusted to accommodate increased pretrial publicity by using a jury questionnaire and by drawing a wider panel of potential jurors than normal. Many other courts presiding over prominent cases—including many cases involving the events of January 6[4]—have used these precautions to protect defendants' rights to a fair trial. *See id*. Only in an "extreme case" will a court presume prejudice exists before conducting voir dire. *Id.* at 381. Because this case does not raise the same type concerns as those in which a presumption has been found, *see, e.g.*, *Rideau*, 373 U.S. 723 (1963), the Court concludes that a presumption of prejudice is not warranted, and denies Defendants' Motion to Change Venue.

---

[4] In denying Defendants' Motion to Change Venue, the Court follows many other decisions denying such motions. *See United States v. Nordean, et al.*, No. 21-cr-175, ECF No. 531 (D.D.C. Nov. 9, 2022); *United States v. Nassif*, No. 21-cr-421, ECF No. 42 (D.D.C. Sept. 12, 2022); *United States v. Brock*, No. 21-cr-140, ECF No. 58 (D.D.C. Aug. 31, 2022); *United States v. Williams*, No. 21-cr-618, ECF No. 63 (D.D.C. Aug. 12, 2022); *United States v. Herrera*, No. 21-cr-619, ECF No. 54 (D.D.C. Aug. 4, 2022); *United States v. Garcia*, No. 21-cr-129, ECF No. 83 (D.D.C. July 22, 2022); *United States v. Bledsoe, et al.*, No. 21-cr-204 (D.D.C. July 15, 2022) (Minute Order); *United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 176 (D.D.C. June 28, 2022); *United States v. Williams*, No. 21-cr-377 (D.D.C. June 10, 2022) (Minute Order); *United States v. McHugh*, No. 21-cr-453 (D.D.C. May 4, 2022) (Minute Order); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022); *United States v. Alford*, No. 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022); *United States v. Bochene*, No. 21-cr-418, ECF No. 31 (D.D.C. Jan. 12, 2022); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order); *United States v. Caldwell, et al.*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021).

## IV.   CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** that Defendants' Motion to Change Venue, ECF 203, is **DENIED**.

**SO ORDERED.**

DATE: December 14, 2022

_____
Jia M. Cobb
U.S. District Court Judge
