UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | : | 21 Cr. 537 (JMC) |
| v. | : | |
| JAMES TATE GRANT | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM
<u>IN AID OF SENTENCING</u>**

**INTRODUCTION**

James Grant is a thirty-two old college graduate, who spent his formative years growing up in Pennsylvania, before his father (a retired federal probation officer) and his mother (a retired speech therapist) moved to North Carolina in 2008, to provide a more sustainable environment and better treatment for his schizophrenic older brother. At the time of this offense, James had been accepted to the University of Alabama's School of Law (with a full tuition scholarship) and was preparing to begin his studies in the Fall of 2021. All of that changed as a result of his conduct on January 6, 2021 in front of – and then later inside – the United States Capitol.

James Grant has been continuously incarcerated since January 8, 2022 when his pretrial release was revoked, or for more than thirty-two (32) months. The Probation Office calculated his Total Offense Level as 26, with a Criminal History Category I, which corresponds to a range of 63-78 months. The defendant believes that this guideline overstates his criminal conduct. Based upon the totality of circumstances of this case, the defendant's personal history and characteristics, and all the factors set out in 18 U.S.C. Section 3553(a), including the need to avoid unwarranted sentencing disparity, **the defense respectfully requests a downward variance to a sentence of time served**, followed by an appropriate period of supervised release.

The defendant has written the Court a letter expressing regret for his actions on January 6, 2021, which is attached as Exhibit 1 to this memorandum. In addition, Mr. Grant's family have written letters attesting to his decency, and good character. Those letters are attached as Exhibit 2.

The paramount consideration in federal cases is that the sentence imposed be "sufficient, but no greater than necessary" to punish and to "promote respect for the law." Kimbrough v. United States, 552 U.S. 85, 101 (2007). What promotes respect for the law is a fair sentence, one that is tempered by justice not driven solely by the need to punish.

## RELEVANT BACKGROUND FACTS

### 1. The Events Of January 6, 2021

As this Court knows, on January 6, 2021, the defendant was present on the Capitol grounds at a location known as the Peace Circle. James Grant, his co-defendants, and others (including many other persons who were not criminally charged) engaged in a back and forth pushing with several Capitol Police officers who were stationed on the other side of a temporary barricade consisting of five interlinked metal bicycle stands. During the "to and fro" one of the bicycle racks became stuck on the outcropping of a stone wall; when an unidentified third person released the rack, all the connected stands lurched forward and toppled over.

James Grant was positioned directly in front of Officer D.C., who did not suffer any injuries during the events of January 6, 2021. As the below photograph demonstrates, the defendant's view of the events on the other side of the bicycle racks was obstructed by the sign directly in front of him.



As the Court knows, the defendants in this case were all strangers to each other, who as the result of happenstance were at the same place at the same time. Accordingly, there was no communication between them before or during the events at the Peace Circle and no effort to coordinate pushing against the barrier. More importantly, the bicycle racks always remained parallel to the law enforcement officers on one side and the protestors on the other. That is, neither Mr. Grant nor his co-defendants made any effort to turn them sideways and use it offensively. The defendant didn't plan to attack the officers; they were blocking his way forward towards the Capitol. For his participation, James Grant was singled out by a Capitol Hill police officer who decided to administer his own brand of justice by pummeling the defendant in the face with a closed fist at point blank range. The defendant did not retaliate. Finally, the defendant did not – as the Government has repeatedly claimed – try to pull Officer C.R. into the crowd of protestors. That claim is debunked by a simple viewing of the video which clearly shows the defendant pulling Mr. Randolph away from the officer. The following still frame from the video shows the moment before the officer's attack on James:



The defendant ultimately made his way past the barrier, then entered the Capitol building, wandered through the halls, entered a Senator's office, where he was photographed sitting calmly.



He left the Capitol approximately twenty-eight minutes later. There was no evidence introduced at trial that Mr. Grant engaged in any violence inside the Capitol.

Unlike many of the defendants charged the events of January 6, 2021, the Government did not present any evidence of vitriolic, anger filled social media postings by the defendant or threats to harm persons or property, either before, during or after these events. Instead, the prosecution located two emails he sent to members of the Georgia legislature, urging them not to certify the vote, consistent with his First Amendment right to petition the Government. In the defense view, the lack of any such evidence warrants consideration by the Court in favor of a downward variance.

The defendant is prepared to admit – through counsel – that he was under the influence of drugs during these events and does not have a complete memory of what happened outside and inside the Capitol that day.

## 2. The Trial Of These Charges

James Grant was charged in the Fourth Superseding Indictment with the following offenses:

Count One - Civil Disorder, in violation of 18 U.S.C. Section 231(a)(3), 2;

Count Two - Assaulting A Law Enforcement Officer (C.E.) With A Deadly Or Dangerous Weapon, in violation of 18 U.S.C. Section 111(a)(1), (b)

Count Three - Assaulting A Law Enforcement Officer (D.C.) With A Deadly Or Dangerous Weapon, in violation of 18 U.S.C. Section 111(a)(1), (b);

Count Five -Entering or Remaining in a Restricted Building or Grounds with a Deadly Dangerous Weapon, in violation of 18 U.S.C. Section 1752(a)(1) and (b)(1)(A);

Count Six - Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

Count Seven – Physical Violence In A Restricted Building Or Grounds With A Weapon

Count Eight - Disorderly Conduct On Capitol Grounds, in violation of 40 U.S.C. Section 5104(e)(2)(D);

Count Nine – Act Of Violence On The Capitol Grounds, in violation of 40 U.S.C. Section 5104(e)(2)(F);

Count Ten – Obstruction of An Official Proceeding, in violation of 18 U.S.C. Section 1512(c)(2).

Count Fourteen - Entering and Remaining in Certain Rooms of The Capitol, in violation of 40 U.S.C. Section 5104(e)(2)(C); and

Count Fifteen – Parading, Demonstrating Or Picketing In A Capitol Building, in violation of 40 U.S.C. Section 5104

As the Court may recall, the defendant proceeded to trial because the Government's plea offer required an admission of guilt as to Count Two, which charged an assault with a dangerous weapon on police officer C.E. that resulted in serious bodily injury. This Court acquitted the defendant of that count. Had the defendant been able to plead guilty, he would have received a three-level downward adjustment, reducing his guideline range to Level 23, or 46-57 months.

The defendant also agreed to a non-jury trial, deciding along with all his co-defendants that the Government's inchoate theory of criminal liability for the events at the bicycle racks would not stand up to the scrutiny of a trained jurist. Prior to the start of the trial, James took steps to accept responsibility for his conduct and pled guilty to the misdemeanor charges contained in Counts Fourteen and Fifteen of the Fourth Superseding Indictment. After hearing the Government's evidence during a week and a half long trial, this Court returned a verdict finding the defendant not guilty of Counts 2, 5, 6, and 7.  Post-conviction, the Government moved to dismiss Count Ten as a result of the Supreme Court's decision in *Fischer v. United States*, 2024 WL 3208034 (June 28, 2024).

Thus, in the final analysis, James Grant was convicted of only four of nine counts by trial, plus the two misdemeanor offenses that he pled to and one count dismissed by the Government.

## LEGAL ANALYSIS

The events that took place at the Capitol on January 6, 2021 have left a permanent mark on this Country. The Department of Justice has prosecuted more than 1250 defendants, some of whom planned and then committed violence against law enforcement officers and others to prevent what they (incorrectly) believed was a stolen election. But not everyone who came to Washington, D.C. on January 6, 2021 harbored bad intentions – and that includes James Grant. This Court concluded after trial that his conduct on that winter's day violated the law, but the events which unfolded were the result of circumstances and poor decision-making, not planning and preparation or bad motive.

The prosecution of January 6 defendants has also revealed a vast chasm between the sentences requested by the Government and those imposed by the judges in this district. Even a cursory review of the most recent Department of Justice chart containing this information reveals that at every level of relative culpability, the courts have imposed sentences far below that requested by the prosecutors. See www.justice.gov/usao-dc/media/1331746/dl?inline (chart dated September 7, 2024). The sentencing memoranda in this case are being filed simultaneously by the Government and the defense, but undersigned fully expects the prosecution to request a sentence much greater than is warranted.

This memorandum analyzes the need to avoid unwarranted sentencing disparity at greater length herein, the following are examples of defendants who committed more violence than James Grant and received below guideline sentences consistent with the defense request in this case.

***United States v. Thomas Hamner***, 21-cr-689 (ABJ): The defendant was one of the first to breach the fencing around the Capitol perimeter. He was involved in wrestling barricades away from

police on the west front, then assisted others in hurling a 10x10 Trump billboard at police. Hamner pleaded guilty to assault on an officer using a dangerous weapon (111b) and was sentenced to 30 months incarceration, notwithstanding the Government recommendation of 84 months

***United States v. Edward Rodriguez***, 21-cr-483 (DLF):  The defendant pled guilty to assaulting officers with a dangerous weapon (111b). He was sentenced to 36 months incarceration notwithstanding the Government's request for a sentence of 88 months. Rodriguez joined others in pushing against police on the west front and then spraying officers with bear spray, hitting at least one of them directly in the eyes and injuring at least eight officers with the chemical irritant. Many of the officers required hospital care and recalled extreme pain and injuries.

***United States v. Nicholas Brockoff***, 21-cr-524 (CKK): The defendant threw an unidentified item at police officers and then assaulted multiple police officers in different locations using a fire extinguisher. During these events, he obtained a police officer's helmet and wore it throughout his afternoon rioting. The defendant entered the U.S. Capitol Building through a broken window that led to a Senate conference room; and once inside the building kicked in a door to gain entrance into a different, locked Senate conference room, which allowed others to enter the room as well; and rifled through belongings in the Senate taking home writing on a Senate notepad. Brockoff pleaded guilty to assaulting officers using a dangerous weapon (111b) and was sentenced to 36 months incarceration as opposed to the Government recommendation of 51 months.

### 1.  This Court Has The Discretion To Impose A Below Guidelines Sentence

It is standard for a defense sentencing memorandum to recite the established legal principles that govern the way the federal sentencing guidelines are to be imposed. For purposes of this case, , however, it is critical to point out that federal judges are no longer relegated to the status of "automatons," armed with calculator and pencil and the federal sentencing guidelines manual. Thus, while a sentencing court will begin its analysis with consideration of the relevant guideline range, it "should" entertain arguments from the parties as to whether a non-guidelines sentence is appropriate. Rita v. United States, 551 U.S. 338, 351 (2007). In making this decision, the trial court will generally consider the sentencing factors set forth in 18 U.S.C. Section 3553(a). Kimbrough v. United States, 552 U.S. 85, 109 (2007). Without doubt the district courts have the discretion to impose a non-guideline sentence based upon their assessment of each individual case. See Gall v. United States, 552 U.S. 38, 47-48 (2007)(abuse of discretion

standard applies to review of sentence outside guideline range and there is no mathematical test for reasonableness of sentence).

That analysis thus begins with the calculation of the sentence guideline that applies to this case.

## SENTENCING GUIDELINE CALCULATION

The Probation Office concluded that Counts One (Civil Disorder) and Count Three (Assault On a Law Enforcement Officer With A Dangerous Weapon) are grouped for sentencing and that the following sentencing guideline calculation applies:

| | | |
|---|---|---|
| Base Offense (Aggravated Assault) | 2A2.2(a) | 14 |
| Dangerous Weapon | 2A2.2(b)(2)(B) | +4 |
| Conviction For 111(b) | 2A2.2(b)(7) | +2 |
| Official Victim | 3A1.2(b) | +6 |
| | | 26 |
| | | (63-78 months) |

PSR at Paragraph 89-95. [1] Probation recommended as sentence of sixty months.

1. **The PSR Guideline Calculation Is Incorrect And Also Overstates The Defendant's Culpability**

The defense agrees that Counts One and Three should be grouped for purposes of sentencing but objects to the inclusion of a six-level upward adjustment for Official Victim pursuant to 3A1.2(b). In addition, the defense believes that the PSR calculation for Count Three overstates the defendant's culpability by double counting the use of the bicycle racks as a deadly or dangerous weapon.

A. *The Defendant's Conduct Did Not Create A Substantial Risk of Serious Bodily Injury*

Commentary Four to the Aggravated Assault guideline states that if subsection

---

[1] The PSR concluded that with respect to counts 8-9 and 14-15, the Sentencing Guidelines do not apply. See PRS at para. 85. Thus, these counts

2A2.2(b)(7) applies, then the "Official Victim" enhancement from Section 3A1.2 applies. The official victim section contains a range of upward adjustments from three to six levels. In this case, the PSR applied the six levels from subsection Section 3A1.2(c)(1). See PSR at para. 92. That enhancement, however, only applies:

> **If, in a manner creating a substantial risk of serious bodily injury**, the defendant or a person for whose conduct the defendant is otherwise accountable, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom (emphasis added).

In this case, Officer D.C. testified at trial that he suffered no actual injury and this Court did not convict defendant Grant of inflicting serious bodily injury. The PSR does not provide any reason for concluding that a "substantial risk" existed. [2]  Given the absence of any factual predicate, this Court should conclude that this six-level enhancement does not apply.

### The PSR Improperly Double Counted The Use Of A Deadly Or Dangerous Weapon

As a general matter, impermissible "double counting" occurs under the Federal Sentencing Guidelines when "the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes." United States v. Jim, 786 F.3d 802, 815 (10th Cir. 2015). Even when double counting is permitted under the guidelines, the sentencing court can remediate its impact through a downward variance. See, e.g., United States v. Kennedy, 578 F. App'x 582, 595 (6th Cir. 2014)(remand for district court to consider defendant's request for a downward variance because "the sentencing guidelines were unduly harsh due to double counting").

---

[2] The defense believes that the back and forth pushing on the bicycle racks at the Peace Circle created at most, only a *de minimis* risk of any injury in this case with respect to Officer D.C. The injuries sustained by Officer C.E. in Count Two were not the result of the pushing but were caused by an unknown person who released the racks when one was caught up on a low hanging wall, unleashing the rack on the far right (from the defendant's vantage point) causing it to spring forward and knock the Officer down.

In this case, the PSR improperly "double counted" by applying two upward adjustments based upon the use of the same dangerous or deadly weapon. That is, the PSR applied a four-level increase pursuant to 2A2.2(b)(2)(B) for the use of the bike rack. See PSR at para. 90. The PSR then relied upon 2A2.2(b)(7) to impose an additional two levels because the offense of conviction was 18 U.S.C. Section 111(b). That criminal subsection requires that the assault was committed with a dangerous or deadly weapon – the same bicycle rack. Thus, in this case, the defendant is being punished twice for the possession of the same weapon.

The defense has not found any case from this jurisdiction directly considering the application of both these sentencing enhancements. Thus, the matter rests in this court's discretion. But see United States v. Gaddy, 656 Fed. Appx. 628, 631 (4th Cir. 2016)(double counting of enhancements for use of weapon applied because not specifically prohibited by guidelines).

## SENTENCING GUIDELINE FACTORS

Once the guideline offense level has been calculated, the Court then turns to a consideration of the following statutory sentencing factors: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentencing to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment; (3) specific and general deterrence; (4) the need to provide the defendant with training, medical care, or treatment; available sentencing alternatives; (5) consistency in sentencing among similarly-situated defendants; and (6) the need to provide restitution.18 U.S.C. § 3553(a).

The defense believes that these factors support the requested downward variance.

### 1. *Defendant's Personal Characteristics; Mental Health And Drug Addiction*

The rules of conduct that govern the American justice system do not permit the

sentencing judge in a criminal case to "get to know" a defendant. There is no opportunity for conversation or a personal exchange between sentencing judge and defendant. In this case, the Court was able to observe the defendant during the trial, but that is an altogether different matter than knowing who he is. This section of the sentencing memorandum is an effort to fill that gap and provide the court with salient details of defendant's life.

James Grant is the youngest son in a loving family. His father was a federal probation officer and his mother was a speech therapist. James grew up in Pennsylvania, but the family moved to North Carolina in 2008 to provide better treatment for his brother who was diagnosed as a teenager with both bi-polar and schizoaffective disorder. The defendant's brother still has violent outbursts and cannot live on his own. Indeed, James' parents will not be able to come to the sentencing in this case because his brother cannot be left alone. The defendant also reported that his brother's issues took up most of his parents' time as he was growing up. See PSR at para 119. Below is a photograph of the family in happier times.



James also suffers from mental health problems. He has been diagnosed with Generalized Anxiety Disorder and his father told Probation that James also has a history of panic attacks and

depression. See PSR at para. 130. James received mental health treatment in college, but his

mental health issues were exacerbated by his teenage and young adult history of drug abuse.

According to the PSR, James:

> Reported a history of alcohol, cocaine, marijuana, club drug, and opiate use. He began
> consuming alcohol at age 16 and did not drink often until he was 19 years old. He
> reported drinking excessively between the ages of 19 and 21 and cutting down on his
> alcohol use because "drugs became more appealing.
>
> The defendant also experimented with Ecstasy and "molly" around age 19 and used the
> drugs two to three times a month while in college. Additionally, around age 19 the
> defendant was abusing Adderall, Vyvanse and Ritalin (30mg almost every day four times
> per week).
>
> Mr. Grant became addicted to opioids, Opana (painkiller) from the age of 19 to 20. He
> was prescribed Suboxone from 2015 to 2022 . . . .

> James' mental health and drug problems caused him continuing problems in college, and

although it took him seven years, he persevered and in 2018 received his Bachelor of Arts *cum*

*laude* from the University of North Carolina in Raleigh.



Other courts have concluded that long term drug addiction is a mitigating factor in sentencing. In <u>United States v. Hendrickson</u>, 25 F.Supp.3d 1166, 1172 (N.D. Iowa 2014), for example, the Court undertook an extensive review of the current state of medical knowledge about drug addiction and concluded that:

> addiction mitigates a defendant's culpability. By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences.
> . . .

The court in *Hendrickson* found that drug addiction was the basis for a downward variance. <u>Id</u>. at 1179. <u>See</u> <u>also</u> <u>United States v. Walker</u>, 252 F.3d 1269, (D. Utah 2017)(upon consideration of the defendant's drug addiction imposed a ten year suspended sentence for bank robbery; court noted that the defendant "has a long criminal history, which is only surpassed by his long addiction to alcohol and drugs"); <u>United States v. Valdez</u>, 77 F. Supp. 3d 1115, 1141 (D.N.M. 2014)(court imposed a downward variance because the defendant "is a drug addict—he is addicted to heroin and cocaine—and much of his criminality stems from his addiction. That he is an addict is one of the most overwhelming and prominent § 3553(a) factors. . . . ").

Similarly in this case, the defendant's long term drug use impaired his judgment. He was under the influence of drugs during the events of January 6, 2021. This is another basis for the court to impose a downward sentencing variance in this case. In that regard, James acknowledged during this Probation interview that he would benefit from drug treatment upon release from custody. This court can impose such treatment as a condition of probation.

### *The Consequences of January 6, 2021 And The Defendant's Future*

After college the defendant held a series of unskilled jobs to support himself. The defendant advised - and his father confirmed - that James decided to become a lawyer, applied to

various schools and was offered a full scholarship to attend the University of Alabama Law School beginning in the Fall of 2024. The opportunity to attend law school may well be lost to James forever. As his father would relate to Probation, James "made an incredibly stupid decision (regarding his conduct in the instant offense) which is not emblematic of his character." See PSR at para. 121.

The defendant was arrested in this case on October 14, 2021, then released on his personal recognizance on October 21, 2021. On December 7, 2021 the defendant was arrested in Wake County, North Carolina and charged with: (1) Driving While Impaired and (2) and Carrying a Concealed Weapon.[3] The defendant also twice tested positive for the use of amphetamines while on release. As a result of these events, his pretrial release was revoked on December 21, 2021 and he was ordered detained pending trial.

For approximately thirteen months James was incarcerated at the Northern Neck Regional Jail (NNRJ) in Warsaw, Virginia. The facility is renowned for its substandard conditions of confinement, which include inedible meals, lack of adequate medical treatment, and unwarranted punishments. The situation at the NNRJ was so intolerable that another January 6 defendant's counsel had to file an emergency motion with the Court complaining that the deplorable conditions were threatening his client's life. See United States v. Quaglin, 21 Cr. 40 (TNM) at DE 419. Worse, James was housed at Northern Neck during the COVID pandemic and contracted the virus possibly four times. The reason the defendant does not know exactly how many times he contracted COVID is because he was unwilling to report his symptoms to the jail personnel because their response was to place infected inmates into solitary confinement to suffer the illness alone.

---

[3] The North Carolina charges are currently pending trial in state court.

Courts in this jurisdiction (and others) concluded that the COVID -19 pandemic was a basis for a post-sentence reduction under the compassionate release provisions of the First Step Act. <u>See</u>, <u>e.g.</u>, <u>United States v. Curtis</u>, 2020 WL 1935543 (D.D.C.)(Howell, C.J.)(covid-19 presents extraordinary and  compelling to reduce sentence). <u>Accord</u> <u>United States v. Mason</u>, 471 F.Supp.3d 225 (D.D.C. 2020)(granting compassionate release after two years to a defendant serving a five year drug sentence). <u>See also</u> <u>United States v. Powell</u>, 468 F.Supp.3d 39 (D.D.C. 2020)(COVID-19 pandemic and defendant's health warranted a post-sentence reduction). If the COVID pandemic was an appropriate basis to reduce an already imposed sentence, then *a fortiori* it is a basis to reduce the sentence in the first instance. Moreover, because the world-wide Covid-19 pandemic is a factor not otherwise considered by the Federal Sentencing Guidelines it is a permissible consideration for this Court in its calculation of an appropriate downward sentencing variance. <u>See</u> <u>United States v. Rhodes</u>, 145 F.3d 1375 (D.C Cir. 1998)( factor not prohibited but not considered by sentencing guidelines can serve as basis for downward variance).

After Northern Neck the defendant was thereafter sent to the FCI Lewisburg, Pennsylvania, where he was incarcerated for almost eight months. James finally arrived in the District of Columbia before the start of the trial of this case and has been incarcerated at the Correctional Treatment Facility since approximately October 2023. Undersigned counsel personally exchanged emails with the District of Columbia Department of Corrections Office of Legal Counsel and confirmed that during his time in the District, the defendant did not receive any disciplinary infractions. In addition, attached to this Sentencing Memorandum is a letter from a D.C. Correctional officer praising the defendant's conduct at the jail and noting that James learned that American Sign Language (ASL) in order to translate for another hearing-

impaired inmate.  A copy of the letter from the correctional officer and the hearing impaired

inmate are attached hereto as Exhibit 3.

The ineluctable conclusion from the defendant's personal history is that he is smart and

hard-working but mental health and drug problems continue to plague him. The defendant's

father told Probation that his son's incarceration has been a "blessing in disguise" because it

forced James to detox and he is now sober, with much better insight into his thought processes.

See PSR at para. 137.

### 2. *Circumstances Of The Offense*

The defendant's participation in the events of January 6, 2021 are well known to the

Court, were dissected at the trial and not only are summarized in this memorandum, but will

surely be repeated in painstaking detail in the Government's sentencing submission. The

defendant understands the gravity of the events writ large at the Capitol, but his conduct – no

matter how much the Government insists otherwise – did not open the floodgates for a horde of

other protestors to storm the Capitol and was not the catalyst for the rioting inside of the

building. The defendant is responsible for his conduct, but not for the actions every other person

who was present at the Capitol that day.

### 3. *Seriousness of the Offense/Promote Respect for the Law/Just Punishment*

There is no doubt that the crime for which defendant James Grant was convicted is a

serious matter. The task of fashioning a sentence to promote respect for the law and to reflect the

seriousness of the offense is in some respects an existential quest. But the defense believes that

its requested sentence of time served after thirty-two months of incarceration would satisfy

this sentencing factor.

#### 4.   *Specific and General Deterrence/Prevent Future Crimes*

The factor of specific deterrence also supports a below guidelines sentence in this case. James has written a letter to this Court explaining expressing regret for his conduct on January 6, 2021. As the Court knows, James went to trial because of the Government's insistence that he plead guilty to Count Two of the Fourth Superseding Indictment; a count that this court acquitted him of after trial. This Court can – and should – give consider this voluntary guilty plea in support of the request for a downward variance.

With respect to general deterrence, the events of January 6, 2021 are in many ways *sui generis* and the events took place more than three and a half years ago. The Department of Justice has arrested more than 1,200 people related to criminal charges for those events and continues to arrest and prosecute others. There is no need to impose any greater punishment on this defendant to serve the ends of general deterrence.

#### 5.   *The Need For Treatment*

As previously noted, the defendant acknowledges the need for drug treatment and agrees to the imposition of condition as part of his period of supervised release.

#### 6.   *The Need To Avoid Unwarranted Sentencing Disparity*

The January 6 prosecutions provide a wealth of statistical data for this Court to consider when determining what sentence should be imposed to avoid unwarranted sentencing disparity. In addition to the cases cited earlier in this memorandum, the following are instructive. All of them involved assaultive conduct by the accused and in every one of them the Court imposed a sentence significantly below that requested by the prosecution.

**United States v. Grayson Sherrill**, 21-Cr-282 (TSC): The defendant violently swung and struck an officer with a metal pole. He then roamed around inside the Capitol building for 34 minutes, joining others in chanting "NANCY." Sherrill was sentenced to 7 months incarceration.  The government requested 41 months.

**United States v. Brian Mock**, 21-Cr-444 (JEB): The defendant helped other rioters remove police barricades at the northern end of the West Plaza and committed four separate assaults against police officers. He pushed one officer to the ground and kicked or attempted to kick him. He threw a broken flagpole at another. He pushed a third officer in the back. Mock shoved a fourth officer to the ground, using both hands and all of his body weight to do so, leaving the officer vulnerable to the mob. Mock then stole two USCP riot shields and passed them back to other rioters. Mock was convicted in a bench trial on all 11 counts, including the assaultive conduct. The Government recommended a sentence of 109 months. Mock was sentenced to 33 months.

**United States v. Bruno Cua**, 21-cr-107 (RDM): The defendant, armed with pepper spray and a stolen baton, attacked a police officer inside the US Capitol building who was attempting to lock the doors to the Senate gallery. After assaulting the officer, Cua then rushed into the gallery, jumped down to the Senate floor and sat in the Vice president's chair with his feet up on the desk. He then opened another door, allowing dozens of other rioters onto the floor. Cua then rifled through multiple desks belonging to US Senators but not before using his jacket to attempt cover the lens of a nearby surveillance camera. Cua was convicted of two felonies (111a and 1512) in a stipulated bench trial and was sentenced to 12 months +1 day. The Government had requested 57 months imprisonment.

**United States v. Leffingwell**, 21-cr-5 (ABJ): Leffingwell, a 57 year old veteran who entered the Capitol at the Senate wing doors and chanted at officers standing before him to "join us" and then, when two officers tried to repel him and the crowd around him, struck both officers in the head, landing three blows, pleaded guilty to assault (111a) and was sentenced to **six months** when the government sought 27 months.

**United States v. Hernandez**, 22-cr-42 (CRC): Hernandez pleaded guilty to assault (111a) and civil disorder (231) after he climbed through the window at the Senate Wing Door, entered the speaker's conference room and senate gallery, he hit a door in the hallway with his flagpole, and attempted to enter where congressional staff were barricaded in an office, he then assaulted a police officer with his flagpole by hitting him in the head. The dangerous weapon enhancement was not applied and he was sentenced by this Court to 24 months. [4]

The defense respectfully requests that this Court should give careful consideration to the decisions of other jurists in this Courthouse who decided to reject the Government's sentencing recommendations under circumstances similar to those presented in this case. And the defense

---

[4] The summary of cases contained in this pleading were selected from the sentencing memorandum filed by the District of Columbia Public Defenders Office in the case of *United States v. Huttle*, 22 Cr. 403 (CRC).

asks this Court to do the same and to sentence defendant James Grant to a period of time served.

## CONCLUSION

The sentencing of any person is a complex task for the Court. Through the submission of this memorandum, the defense has tried to provide context to assist the Court in imposing a sentence that satisfies that requirements of the law and our notions of justice. For all the reasons set forth in this memorandum, the defense asks this Court to grant a downward variance and sentence James Grant to time served.

Respectfully submitted,

*Robert Feitel*

_____
Robert Feitel, Esquire
1300 Pennsylvania Avenue, N.W.
#190-515
Washington, D.C.  20008
D.C. Bar No. 366673
202-450-6133 (office)
202-255-6637 (cellular)
RF@RFeitelLaw.com

## **CERTIFICATE OF SERVICE**

       I hereby certify that a copy of the foregoing was sent via ECF to the Assistant United States Attorneys listed on the case docket and counsel for the co-defendants, this 13th day of September, 2024.

*Robert Feitel*

_____

Robert Feitel